# United States Court of Appeals
## For the First Circuit

No. 02-2039

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY S. MAY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Howard, Circuit Judges.

Thomas L. Goodwin, with whom Strike, Goodwin & O'Brien was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

September 4, 2003

**TORRUELLA, Circuit Judge**. Defendant Barry S. May was charged with two conspiracy counts: involvement in a conspiracy to distribute cocaine and involvement in a conspiracy to distribute marijuana. May pled guilty to the marijuana count and as part of his plea agreement the cocaine count was dismissed. Now May appeals, arguing that the district court erroneously augmented his sentence when it found (1) a kilogram of cocaine attributable to May, (2) his co-conspirator used a dangerous weapon, (3) May had a leadership role in the offense, and (3) three misdemeanor convictions should be included as part of May's criminal history. After careful review, we affirm.

## I. Background

May and Scott Barbour began to obtain and distribute marijuana in Texas, Florida, and Maine in 1996. Over time, others joined in the marijuana distribution, with May heading the operation in Maine.

Typically, Barbour and others purchased marijuana in Texas and shipped it to May and others for distribution in Maine. May retained his share of the proceeds and forwarded the appropriate share to Barbour and others in Texas.

In February 2000, May aided Barbour in the collection of $10,000 in drug debts. At Barbour's trial, May testified that he went to Texas to collect a debt owed by two men for some marijuana they had "strong armed" from Barbour. May, co-conspirator Shane

-2-

Hall, and Barbour got drunk and went to Hall's house, where Hall obtained a .38 caliber pistol; the three then went looking for the debtors.

In May 2000, Barbour sent May a package containing one kilogram of cocaine. No cocaine had previously been involved in the marijuana distribution conspiracy, and Barbour had not told May that cocaine was being sent on this occasion. According to May, the receipt of the cocaine was unexpected and unwanted; May had been treated in 1989-90 for cocaine addiction, and knew proximity to the drug posed a danger of relapse. When he realized Barbour had sent him cocaine, not marijuana, he communicated his anger to Barbour in Texas and to two other conspirators in Maine, Steven Case and Kevin Woodward. He told the three men that he wanted nothing to do with cocaine and that he was withdrawing from the marijuana conspiracy.

The kilogram of cocaine was divided into smaller quantities, and May gave seventeen ounces to Case, ten to Woodward, and retained seven ounces for himself. May established terms of payment for the cocaine. Fearing access to cocaine would cause him to return to his former drug habit, May later gave his seven ounces to Woodward.

May denied having anything to do with distributing the cocaine after its receipt and division. He also denied both paying for the cocaine and accepting payment for Barbour.

In spite of his statements to his co-conspirators, May did not immediately withdraw from the marijuana conspiracy. He continued to receive and distribute marijuana (but not cocaine) from Texas, primarily from one Todd Massey. As part of the ongoing conspiracy, there was a further shipment to Maine of forty-two ounces of cocaine, but this went directly to Case without May's knowledge or participation.

On October 16, 2001, a federal grand jury indicted May and Barbour on two counts of conspiracy. Count One alleged that between January 1, 1999 and October 1, 2001, May and Barbour conspired to distribute and to possess with intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 ("the cocaine count"). Count Two alleged that during the same time period May and Barbour conspired to distribute and to possess with intent to distribute more than fifty kilograms of marijuana, in violation of 21 U.S.C. §§ 841 (a)(1), 841 (b)(1)(C), and 846 ("the marijuana count").

On January 2, 2002, May pled guilty to the marijuana count. The plea agreement provided that the maximum statutory sentence was twenty years' imprisonment under 21 U.S.C. § 841 (b)(1)(C). The government agreed to move to dismiss the cocaine count after sentencing on the marijuana count. The plea agreement did not contain stipulations for sentencing guidelines calculations.

Prior to sentencing, the parties stipulated that the quantity of marijuana attributable to May as relevant offense conduct was between 700 and 1,000 kilograms, corresponding to an offense level of thirty. The parties disagreed as to whether any cocaine should be counted as relevant offense conduct, whether there should be a deadly weapon enhancement, and whether three misdemeanors should be included in the criminal history calculation. These questions were submitted to the district court for determination at the sentencing hearing.[1]

The district court accepted the stipulation of the parties regarding marijuana quantity, and attributed one kilogram of cocaine to May as relevant offense conduct.[2] This attribution

---

[1]  At the sentencing hearing, the district court heard the testimony of defense counsel, the government, and May. In addition, the district court judge could take into account the testimony from the Barbour trial, over which he presided and of which a transcript was submitted as evidence at the sentencing hearing. Along with the presentence report, these are all appropriate sources of facts at sentencing. Cf. United States v. Garafano, 36 F.3d 133, 135 (1st Cir. 1994) ("Normally the trial court makes its own assessment of the facts that pertain to sentencing, drawing on trial evidence, the presentence report, any evidence offered at the hearing, and other appropriate sources."); see also United States v. Sklar, 920 F.2d 107, 110 (1st Cir. 1990) (indicating rules of evidence do not apply at sentencing and that the court may consider "virtually any dependable information").

[2]  The government had argued for attribution of an additional forty-two ounces of cocaine, but the district court made no finding about that quantity since it would not change the offense level under the guidelines.

The district court determined that May had been "effectively in joint possession, constructive possession of [the kilogram of] cocaine at the time," and accordingly held him responsible for it.

-5-

resulted in raising the base offense level from level thirty to level thirty-two.  The district court imposed upward adjustments of four levels for role in the offense and two levels for possession of a firearm, and a downward adjustment of three levels for acceptance of responsibility, resulting in an adjusted offense level of thirty-five.  May's criminal history category was determined to be Category III, based on the inclusion of, among other past offenses, convictions for the misdemeanors of terrorizing, assault, and criminal mischief. Offense level thirty-five and criminal history Category III combined to produce a guidelines range of 210 – 262 months.

Upon the government's § 5K1.1 motion for downward departure, the district court departed downward and sentenced May to 174 months' imprisonment, to be followed by three years of supervised release.  May now appeals the sentence.

## II.  <u>Analysis</u>

May argues the sentencing court erred in several respects.  First, May argues that the drug quantity determination was erroneous because the kilogram of cocaine should not have been attributed to him as relevant offense conduct.  Second, May questions the enhancement for a co-conspirator's possession of a

---

The district court went on to say, "you did not distance yourself enough from it, although I understand emotionally in your mind, you think you did, you did not take part in it. But so far as the law is concerned, you are responsible for that."

deadly weapon, claiming that such possession is not always reasonably foreseeable during an attempt to collect a drug-related debt. Third, May posits that the district court erred in finding May to be a leader or organizer. Finally, May believes the district court erred in including three misdemeanors as part of his criminal history. We address each argument in turn.[3]

## A. Drug Quantity

Under the United States Sentencing Guidelines, a court is to consider all relevant conduct in determining the quantity of drugs for which a defendant is responsible. U.S.S.G. § 1B1.3. A preponderance of the evidence standard applies to the determination of drug quantity, United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001), and a sentencing court's drug quantity determination is a factual matter that will not be disturbed on appeal unless it is clearly erroneous. United States v. Innamorati, 996 F.2d 456, 489 (1st Cir. 1993).

A defendant may be held "responsible for drug quantities which [he himself] sold, transported or negotiated" as part of a

---

[3] Only the first issue was briefed by counsel and addressed at oral arguments, but May raised the others in his pro se brief. May's additional argument regarding the existence of two separate conspiracies fails because this Court presumes conspiracies exist absent an affirmative showing of their termination. United States v. Elwell, 984 F.2d 1289, 1293 (1st Cir. 1993). The argument that the inclusion of the cocaine constituted an amendment of the indictment is similarly doomed. Cf. United States v. Reyes, 3 F.3d 29 (1st Cir. 1993) (upholding inclusion as relevant conduct of drug transactions that were initially charged but dropped).

conspiracy.  United States v. Miranda-Santiago, 96 F.3d 517, 524 (1st Cir. 1996).  In addition, a defendant is accountable for "reasonably foreseeable quantities of contraband."  U.S.S.G. § 1B1.3, cmt. n.2.  In this case, the sentencing court found May responsible for a kilogram of cocaine not because May had any "reason to foresee the cocaine was going to turn up" but rather because he was "effectively in joint possession, constructive possession of that cocaine."  The court remarked on May's failure to act after receiving the cocaine, stating:

> You could have left right then. You could have turned it in. You didn't do any of that. Instead, you stayed. You went with it and were there to see it broken up and ultimately, went into the distribution channels. And you were effectively in joint possession, constructive possession of the cocaine at the time, and you are responsible for it.

The court's conclusion regarding May's joint and constructive possession of the cocaine is well-supported by the record.  According to May's own statement at his sentencing hearing, he was present when Woodward and Case divided the kilogram of cocaine into smaller amounts for further distribution.  Further, May personally distributed cocaine to Case and Woodward, and had seven ounces in his own possession for a period of time.  See United States v. Georgacarakos, 988 F.2d 1289, 1296 (1st Cir. 1993) ("Constructive possession exists if the defendant knows the drugs are available and has the power and intent to exercise dominion and control over them."); see also United States v. Batista-Polanco,

-8-

927 F.2d 14, 18-19 (1st Cir. 1991) (defendant sitting at table with others while heroin was being packaged was in joint constructive possession of drug). Certainly, by personally transferring control of the cocaine to others and by having an amount of the drug in his own possession however briefly, May was "directly involved" with the drug, which suffices to hold him accountable for the contraband. <u>See</u> U.S.S.G. § 1B1.3, cmt. n.2.

Moreover, the delivery of the kilogram of cocaine alone would have sufficed to render the cocaine relevant conduct to May. <u>See</u> <u>United States</u> v. <u>Young</u>, 78 F.3d 758, 763 n.5 (1st Cir. 1996) (transactions involving different drugs but same conspirators and a common scheme made both drugs relevant conduct). May, Barbour, Woodward, and Case were all members of the same criminal enterprise that had been distributing marijuana for almost four years. The same people and process were used for the cocaine as for the marijuana, again reinforcing the district court's decision to attribute the cocaine to May. <u>See</u> U.S.S.G. § 1B1.3, cmt. n.9(A); <u>United States</u> v. <u>Wood</u>, 924 F.2d 399, 404 (1st Cir. 1991) (taking into account conduct that involved the same mode of distribution and transaction type as the charged drug offense).

Because of May's direct involvement with the handling of the kilogram of cocaine and the use of the marijuana distribution system for the cocaine, we find that the district court's inclusion of the cocaine in the drug quantity was not clearly erroneous.

**B. Deadly Weapon Enhancement**

May challenges the two-level enhancement for the presence of a gun, arguing that the district court erroneously held that it is foreseeable that guns will always be involved in the collection of drug debts. Where only a guideline's application to the facts of a case is at issue, we review for clear error. United States v. Jackson, 3 F.3d 506, 509 (1st Cir. 1993).

A two-level increase in offense level is mandated "[i]f a dangerous weapon (including a firearm) was possessed" in the course of a drug offense. U.S.S.G. § 2D1.1(b)(1). The enhancement applies "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id., cmt. n.3. In a conspiracy case, the government must first show that one of the defendant's co-conspirators "possessed a weapon during the offense." United States v. Nelson-Rodríguez, 319 F.3d 12, 59 (1st Cir. 2003). Once the government demonstrates the possession of a gun, the burden is on the defendant to show that the connection between the gun and the drug crime was "clearly improbable." See Jackson, 3 F.3d at 509.

In this case, the government demonstrated a gun was used in the course of the conspiracy. May went to Texas to help Barbour collect a marijuana debt. One of May's co-conspirators brought a .38 caliber pistol along when they went to collect the debt; May's testimony at Barbour's trial indicated he knew his co-conspirator

-10-

had the gun.  May presented no evidence to show the improbability of the connection between the gun and the conspiracy.  Given May's failure to show that the gun was likely not connected to the conspiracy, we cannot say that the district court erred in applying the deadly weapon enhancement.

## C.  Role in the Offense

May also challenges the application of the four-level enhancement for being an "organizer or leader of criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1.  Application of this enhancement is reviewable only for clear error.  United States v. Olivier-Díaz, 13 F.3d 1, 4 (1st Cir. 1993).  We have noted before that "battles over a defendant's status . . . will almost always be won or lost in the district court" because "the assessment of the appellant's role in the offense of conviction is factbound."  United States v. Conley, 156 F.3d 78, 85 (1st Cir. 1998) (internal quotation omitted).

May concedes that he was a "key player" and a "manager" but argues that he had a middleman role which should result in a three-level managerial enhancement as opposed to a four-level enhancement for a leadership role.  Among the relevant factors in determining the role of a defendant are:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the

-11-

offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n.4.

The record here provides ample support for the finding that May was a leader or organizer of the marijuana conspiracy. The conspiracy which May and Barbour instigated in 1996 involved at least seventeen participants. According to the presentence report and by May's own admission, May's role in the conspiracy included recruiting participants to the conspiracy as well as strawmen in Maine to be used for delivery of the marijuana from Texas. May collected the marijuana from the delivery sites, took it to others, received payment, and divided the proceeds among the participants. He was personally involved in the collection of drug debts, and typically kept for himself a larger share of the proceeds than anyone except Barbour. When Barbour was arrested in 2000, it was May who took over the business with Massey. The evidence at Barbour's trial showed that a co-conspirator identified May as the person in charge of the Maine end of the operation and used the present tense in giving that description. Cf. Olivier-Díaz, 13 F.3d at 5 (finding sufficient support for determination that defendant was a leader or organizer where, among other things, he recruited others to distribute the drugs, "supervised the

collection of debts," and oversaw the operations when two of his co-conspirators were in prison).[4]

On this evidence, the trial court's conclusion that May had a leadership role, rather than a managerial one, cannot be said to be clearly erroneous.

## D.  Criminal History

May's final argument is that his criminal history score was improperly calculated because the district court erroneously took into account three convictions for misdemeanors.  He renews the argument made at his sentencing hearing that the three misdemeanors are sufficiently similar to the crime of disorderly conduct to merit exclusion from the criminal history calculation.

A sentencing court should consider felonies, misdemeanors, and petty offenses for criminal history purposes unless the misdemeanor or petty offense falls within one of the

---

[4]  May argues that the fact that the conspiracy stopped during part of Barbour's time in prison is evidence that it was Barbour and not May who led the drug ring.  First of all, the presentence report indicates that, while the conspiracy slowed during Barbour's initial time in custody, it did continue.  After a temporary hiatus in July 1998, May and Massey continued the distribution during another of Barbour's stints in prison in 2000.  More than one person can have a leadership role in a conspiracy.  See U.S.S.G. § 3B1.1, cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."); see also United States v. Andújar, 49 F.3d 16, 25 (1st Cir. 1995) (affirming determination that defendant was a leader in spite of the fact that someone else was  "running the show" because the defendant was the ultimate organizer's "personal contact, or principal man, . . . and in that sense he was the leader, a leader and organizer").  Here, May was Barbour's contact in Maine and led the operation in that state.

exceptions provided by the guidelines. U.S.S.G. § 4A1.2. One exception provides that a conviction for disorderly conduct or a "similar" offense is "counted only if (a) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." U.S.S.G. § 4A1.2(c)(1). The application of a guideline to the facts is reviewable for clear error. See United States v. Camilo, 71 F.3d 984, 986 (1st Cir. 1995).

May contends that his 1989 conviction for terrorizing is sufficiently similar to disorderly conduct to be excluded from his criminal history. In that instance, May received a sixty day suspended sentence and one year of probation. Under the terms of § 4A1.2(c)(1)(A), even if the crime was similar to disorderly conduct or any other enumerated crime, it would count towards criminal history where "the sentence was a term of probation of at least one year." See also United States v. Gray, 177 F.3d 86, 89 n.1 (1st Cir. 1999). Thus, the terrorizing misdemeanor was properly considered toward his criminal history.

Next, May argues his prior assault conviction was also sufficiently similar to the crime of disorderly conduct to qualify for exclusion. Relying on United States v. Unger, 915 F.2d 759 (1st Cir. 1990), May argues that the court erred in considering the conduct involved in the assault. He posits that the elements of the crime are sufficiently similar to those of the crime of

-14-

disorderly conduct, as defined by the Model Penal Code, to justify exclusion of the misdemeanor.

May's argument is flawed. May misconstrues Unger, which dictates that courts consider not just the statutory elements of an offense as compared to those of an exception, but also "the substance of the underlying state offense in order to determine whether it falls within the proscription" of § 4A1.2(c)(1)(A). 915 F.2d at 763; see also United States v. Spaulding, 2003 U.S. App. LEXIS 15512, at *4 n.1 (1st Cir. Aug. 4, 2003) (applying Unger, which was about U.S.S.G. § 4A1.2(c)(2), to cases involving U.S.S.G. § 4A1.2(c)(1)). Thus, the district court did not err in observing that he "knocked somebody down and kicked them" and using the behavior to distinguish the assault from disorderly conduct.

Assault is not one of the offenses enumerated in § 4A1.2 (c)(1)(A), but we evaluate the similarity between it and the listed offense of disorderly conduct. The statutory elements and the punishment provided for each offense are among the factors that deserve comparison in the assessment of similarity. See United States v. Reyes-Maya, 305 F.3d 362, 366 (5th Cir. 2002). The two crimes, as defined by Maine law, are clearly different. The assault statute requires physical injury or contact[5] whereas the

---

[5] Under Maine's all-purpose assault statute, "[a] person is guilty of assault if he intentionally, knowingly, or recklessly causes bodily injury or offensive physical contact to another." Me. Rev. Stat. Ann. tit. 17-A, § 207(1) (2003). By statute, bodily injury is defined as "physical pain, physical illness or any impairment of

-15-

disorderly conduct statute is simply aimed at "annoyance."[6] Further, the maximum punishment for assault is twice that for disorderly conduct.[7] Thus, trying to draw a comparison between the two crimes is futile.

Similar reasoning applies to the third misdemeanor conviction. First, as described above, the court correctly considered the conduct involved, which here included throwing beer bottles at a moving vehicle and continued damage even after the vehicle stopped. The court distinguished the conduct at issue from that contemplated in disorderly conduct, saying:

> if indeed you'd been throwing those bottles at a wall where they just broke harmlessly, that might have been disorderly conduct, but you were throwing them at a moving vehicle. And when it stopped, you jumped on and continued to damage it. That distinguishes it from the disorderly conduct . . . .

Second, a comparison of the statutes confirms the inclusion of the misdemeanor in the criminal history. Criminal mischief is defined as the intentional, knowing, or reckless damage

---

physical condition." Me. Rev. Stat. Ann. tit. 17-A, § 2(5) (2003); see also United States v. Nason, 269 F.3d 10, 18 (1st Cir. 2001).

[6] Maine's statute defines disorderly conduct as conduct that "intentionally or recklessly causes annoyance to others" by such means as "making loud and unreasonable noises," causing "noxious or offensive odors" to be released, or fighting. Me. Rev. Stat. Ann. tit. 17-A, § 501 (2003).

[7] Assault is punishable by up to a year in prison, see Me. Rev. Stat. Ann. tit. 17-A, § 1252(1)(D) (2003), whereas disorderly conduct is punishable by a maximum of six months in prison, see Me. Rev. Stat. Ann. tit. 17-A, § 1252(1)(E) (2003).

or destruction of another's property without a right to do so.  Me. Rev. Stat. Ann. tit. 17-A, § 806 (2003).  The misdemeanor is punishable by up to one year in prison.  See id; Me. Rev. Stat. Ann. tit. 17-A, § 1252(1)(D).  As discussed above, disorderly conduct involves but does not require destruction and is punishable by up to six months in prison.  Me. Rev. Stat. Ann. tit. 17-A, § 501; Me. Rev. Stat. Ann. tit. 17-A, § 1252(1)(E).  We hold May's criminal mischief constituted an offense that differed sufficiently from that of disorderly conduct to support its inclusion in the criminal history computation.

The district court calculated the criminal history category properly by including all three misdemeanors.

### III.  Conclusion

For the foregoing reasons, the district court's judgment is affirmed.

**Affirmed**.