# United States Court of Appeals
## For the First Circuit

No. 03-1229

UNITED STATES,

Appellee,

v.

SCOTT A. BARBOUR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U. S. District Judge]

Before

Selya, Circuit Judge,
John R. Gibson,[*] Senior Circuit Judge,
and Howard, Circuit Judge.

William Gray Schaffer, for appellant.

Margaret D. McGaughey, Appellate Chief, Assistant United
States Attorney, with whom Paula D. Silsby, United States Attorney,
was on brief, for appellee.

December 29, 2004

---

[*]Hon. John R. Gibson, of the Eighth Circuit, sitting by
designation.

**JOHN R. GIBSON, <u>Senior Circuit Judge</u>**.  Scott A. Barbour appeals his conviction of one count of conspiracy to possess with the intent to distribute and distribution of at least 500 grams of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B) (2000), and one count of conspiracy to possess with the intent to distribute and distribution of at least fifty kilograms of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C). On appeal, Barbour raises four arguments: sentencing factor manipulation, prosecutorial misconduct, improper jury instruction on drug quantities, and errors in interpreting and applying sentencing guidelines.  We affirm.

Barbour was convicted in Texas in 1996 for wire fraud arising from a telemarketing scheme and was sentenced to eighteen months' imprisonment.  After he served that term, his supervised release was revoked in 1998, and he went back to prison until 1999. He was again put on supervised release and required to live at a halfway house in Maine.  In late October of 1999, while Barbour was still on supervised release, he moved from Maine to Texas, which violated the terms of his supervised release.  An arrest warrant was issued two days later, but it was not served on Barbour until October 2000.  In the intervening period, he had established residence and a fictitious identity ("Jon Kugler") in Houston, Texas and had begun shipping marijuana to Barry May, who sold it to Maine drug dealers.  Barbour and his family left Houston in the

late summer of 2000.

Following his arrest in October 2000, Barbour was sentenced to an additional twelve months' imprisonment. On the final day of his imprisonment, in October 2001, Barbour and May were arrested and indicted for conspiracy to possess and distribute cocaine and marijuana from January 1, 1999 through October 1, 2001. A jury found Barbour guilty of both counts, and the district court sentenced him to 420 months' imprisonment.

The issues raised by Barbour do not require that we deal extensively with the trial record concerning the details of the conspiracy.

## I.

Barbour argues that the government's nine-month delay in executing on an arrest warrant and twenty-one-month delay in bringing conspiracy charges constituted impermissible sentencing factor manipulation. He argues that Agent Baril and the Assistant United States Attorney knew in early 2000 that Barbour was in Houston using the alias "Jon Kugler," but they took no serious action to execute on the November 1999 warrant until September 2000 when agents raided the house that he had been living in. Barbour argues that Baril was motivated by improper personal animus in delaying the arrest and charges to increase Barbour's potential sentence. Barbour attempts to show Baril's personal animus toward him through Baril's testimony that he was waiting for "the right

moment" to arrest Barbour. Barbour argues that Baril waited to arrest Barbour for no legitimate reason, but only to frustrate Barbour and increase his sentence.

It is the defendant's burden to show sentencing factor manipulation by a preponderance of the evidence. United States v. Gibbens, 25 F.3d 28, 31-32 (1st Cir. 1994). We review the district court's determination of whether manipulation occurred for clear error. Id. at 32. A district court's determination is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the "definite and firm conviction that a mistake has been committed." United States v. Newton, 326 F.3d 253, 257 (1st Cir. 2003)(quoting Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1080 (1st Cir. 1995)).

Sentencing factor manipulation occurs where law enforcement agents venture outside the scope of legitimate investigation and engage in extraordinary misconduct that improperly enlarges the scope or scale of the crime. United States v. Egemonye, 62 F.3d 425, 427 (1st Cir. 1995). A manipulation claim can be established by showing that the agents overpowered the free will of the defendant and caused him to commit a more serious offense than he was predisposed to commit. United States v. Connell, 960 F.2d 191, 196 (1st Cir. 1992).

A typical sentencing factor manipulation claim involves undercover agents participating in criminal activity with the

defendant and waiting to make an arrest for the sole purpose of increasing the defendant's sentence by encouraging the commission of a crime that the defendant was not predisposed to commit. See, e.g., Egemonye, 62 F.3d at 427; Gibbens, 25 F.3d at 30-31. This is not such a case because there was no pressure to commit a more serious crime, no agent involvement in Barbour's crimes, and there was a legitimate reason to delay Barbour's arrest.

Analysis of a sentencing factor manipulation claim focuses primarily (though not exclusively) on the conduct and motives of the government. Gibbens, 25 F.3d at 31. The government has "broad latitude" in investigating crime and can lengthen an investigation to explore the size, techniques and participants involved in a criminal operation. Egemonye, 62 F.3d at 427-28.

The district court rejected Barbour's claim of sentencing factor manipulation because agents did not encourage Barbour or "lead him into new criminal conduct," and because it found there was a legitimate reason to delay Barbour's arrest. The district court described Barbour as the leader of an extremely large, five-year drug conspiracy. The government identified at least eighteen participants, most of whom communicated using false names and code words. The participants frequently switched cell phones and land lines. The method of drug transportation evolved from tackle boxes to PVC pipes to Volkswagen vehicles to commercial shrink wrap packaging. Barbour avoided police by moving from Maine to Texas,

to New Hampshire, and to Florida, where he was arrested. During the year before Barbour's 2001 arrest, Agent Baril identified five additional participants in the conspiracy and obtained additional telephone and shipping records. The agents in this case kept up with the constantly changing size, techniques, and participants of the conspiracy. This is exactly the type of investigative work Egemonye considered within the legitimate scope of government agents' authority. 62 F.3d at 427.

The record reveals no improper conduct on the part of the agents during that investigation. There is no indication that agents pressured or coerced Barbour to "achieve a new level of crime." Id. No undercover agent bought drugs from, or sold drugs to, Barbour. Agents had no contact with Barbour until his arrest.

The record reflects no improper law enforcement motive. We have said that racial hostility or personal animus would be an improper motive. Id. at 428. Even if Baril's comment about waiting for the "right moment" could be interpreted as personal animus, as Barbour argues, it is also amenable to an innocent interpretation. Baril said he was waiting to be sure he had sufficient evidence for a conviction. He was also waiting to identify more of the conspirators and gather evidence against them. A district court's choice between two or more reasonable interpretations of the evidence cannot be called clearly erroneous. Gibbens, 25 F.3d at 32. The district court did not err in

rejecting Barbour's claim of sentencing factor manipulation.

## II.

Barbour argues that the district court did not properly instruct the jury on the government's burden to prove the drug quantities from the indictment, as required by Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The district court instructed the jury that it must find elements beyond a reasonable doubt, but did not characterize the drug quantity determination as an element. Barbour argues this error denied his Fifth and Sixth Amendment rights to a jury verdict on the drug quantities.

The district court included the drug quantities in the verdict form. The verdict form asked, "Did the cocaine conspiracy involve, in total, at least 500 grams of cocaine?" The jury checked the "yes" box. The verdict form asked, "Did the marijuana conspiracy involve, in total," listing several quantities, with instructions to check only one. The jury put a checkmark next to "at least 50 kilograms of marijuana." The jury instructions stated that if the jury found Barbour guilty, it must determine the drug quantities involved, and stated seventeen times that the government's burden of proof was beyond a reasonable doubt.

Barbour raises this Apprendi argument for the first time on appeal; he did not object to the jury instructions at trial or at sentencing. He asks that we excuse his failure to object because the case that established that Apprendi errors may be

raised at sentencing was decided after Barbour's sentencing. United States v. Nelson-Rodriguez, 319 F.3d 12 (1st Cir.), cert. denied, 539 U.S. 938 (2003). Because confusion existed, in Nelson-Rodriguez we assumed that the defendants preserved their objections if they objected either before the jury instructions were given or at sentencing. Id. at 47-48. Barbour did neither, so even if we made the same assumption for him, we would still review for plain error. Id. at 47-49.

Under the plain error standard, we reverse only if a "clear and obvious" error occurred. United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001), cert. denied, 124 S. Ct. 2058 (2004)). That error also must affect the defendant's substantial rights and must seriously impair the fairness, integrity, or public reputation of judicial proceedings. Id.

Any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Apprendi, 530 U.S. at 490. In Perez-Ruiz, we applied the Apprendi rule to drug quantity determinations. 353 F.3d at 16.

Barbour interprets United States v. Goodine, 326 F.3d 26 (1st Cir. 2003), cert. denied, 124 S. Ct. 1600 (2004), as requiring *elements* to be found beyond a reasonable doubt, but allowing *sentencing factors* to be found by a preponderance of the evidence.

-8-

In Goodine, the jury found certain drug quantities, but the judge considered additional quantities in sentencing the defendant. Id. at 27. We applied a preponderance of the evidence standard to the quantities found by the judge and called them sentencing factors rather than elements. Id. at 32. Goodine held that Apprendi was not violated when the sentence imposed exceeded the guideline range for the indicted amount but did not exceed the maximum statutory penalty for the drug quantities found by the jury.

Where a fact finding, other than a prior conviction, increases the statutory maximum, under Apprendi and Harris v. United States, 536 U.S. 545, 550 (2002), the fact must be found by the jury beyond a reasonable doubt. The Supreme Court explained that if, because of the existence of a particular fact, the penalty is to be increased beyond the statutory maximum, that fact must be found by the jury regardless of whether it is a sentencing factor or an element. Harris, 536 U.S. at 550.

The maximum sentence for convictions in which no particular quantity was proved is twenty years for cocaine and five years for marijuana. 21 U.S.C. § 841(b)(1)(C), (D) (2000). The district court sentenced Barbour to 420 months, or thirty-five years, which exceeds the twenty- and five-year statutory maximums in the absence of a quantity determination. Under Harris and Apprendi, before Barbour could be sentenced beyond the statutory maximums based on quantity, the drug quantity must be found by the

-9-

jury beyond a reasonable doubt. The question in this case is whether, on the instructions given, the jury would have understood that it had to find the drug quantities beyond a reasonable doubt.

We held that the jury had not been instructed that it must find drug quantities beyond a reasonable doubt in United States v. Perez-Ruiz and United States v. Nelson-Rodriguez. In Perez-Ruiz, the judge read the quantities listed in the indictment to the jury once and elsewhere stated that the jury must find beyond a reasonable doubt that the indicted conspiracy existed. 353 F.3d at 16. We held that instructions did not forge the necessary link between the concept of drug quantity and the beyond-a-reasonable-doubt standard. In United States v. Nelson-Rodriguez, the court provided a copy of the indictment, which listed the drug quantities, to the jury, but the jury was asked to find only whether there was the conspiracy as indicted, not whether the drug amounts in the indictment were correct. 319 F.3d at 45. The result was that the jury only found that the charged conspiracy existed but did not determine the drug quantities. Id.

Here, in contrast, the jury was given three choices of drug quantities - not all or nothing, but a multiple choice. The jury was asked to specify drug type and quantity, and it did so. It is not tenable to compare this case to Perez-Ruiz or Nelson-Rodriguez, in each of which the jury was not permitted to specify amount and was not alerted to the need to consider the amount in

-10-

its own right.  Here, the district court included the drug quantities in the verdict form.  The jury was instructed that if it found Barbour guilty, it would also "have to answer one or more questions concerning the quantity of the substance involved which may affect the potential sentence."  The jury instructions contained seventeen references to the government's beyond-a-reasonable-doubt burden of proof.  The jury was clearly instructed that the defendant's guilt must be proven beyond a reasonable doubt, and the drug quantity questions that immediately followed connected that burden of proof to the drug quantity determination. The instructions in this case contain a more precise finding of drug quantity and contain a closer link between the burden of proof and the jury's quantity determination than the instructions in either Perez-Ruiz or Nelson-Rodriguez.  The district court did not commit plain error when it instructed the jury on the government's burden of proof and included the drug quantities involved on the verdict form.

### III.

Barbour argues that the Assistant United States Attorney's pervasive misconduct during the trial and the sentencing undermined the accuracy of the fact-finding process and resulted in a fundamentally unfair conviction and sentence.  Only three of Barbour's allegations of misconduct by the Assistant Attorney warrant discussion: (1) whether the Attorney tampered with the

-11-

proffer statements; (2) whether the Attorney improperly bolstered the government's credibility; and (3) whether the Attorney made improper remarks on Barbour's failure to testify during closing.

We review Barbour's claims of prosecutorial misconduct for plain error because he failed to object at trial. United States v. Roberts, 119 F.3d 1006, 1013-14 (1st Cir. 1997).

First, Barbour claims that the Assistant Attorney changed facts in Baril's proffer reports, which rendered them inaccurate and unreliable, and then used the reports during his impeachment of Barry May. The proffer reports were investigative reports prepared by agents of the Maine Drug Enforcement Agency after interviews with cooperating witnesses. Barbour's brief argues that by reviewing and revising proffer reports, the Attorney rendered them unreliable and then injected the contents of the reports before the jury without defense counsel being made aware of the tampering.

Barbour's only support for claiming the Assistant Attorney changed facts is that some of the facts in the reports differed from Baril's recollection[1] or from another witness's recollection. If the proffer reports do not coincide perfectly with the witnesses' memories, that inconsistency does not establish that the Attorney changed facts in Baril's proffer report. Baril

---

[1] Baril remembered May telling him that packages weighed 20-50 pounds, but the proffer said "at least 50 pounds." Baril explained that May gave several different quantity estimates for those packages throughout his interview, and he averaged the quantity in the proffer.

-12-

said during the sentencing hearing that, during an interview, he routinely tries to take notes verbatim and he types them into a report as soon as possible. A copy of that report is sent to the prosecutor, any agents who attended the interview, the witness, and the defense attorney to be reviewed for accuracy. After the report is written and signed, any corrections are made in a supplemental report. Barbour received a copy of Baril's handwritten notes from the interviews. The record does not establish plain error because Barbour has not shown that the Assistant Attorney tampered with any of the proffer reports.

Second, Barbour contends that the Assistant Attorney improperly bolstered the government's credibility during the trial. The Attorney periodically questioned witnesses about what they told "us" or the "agents" in their proffer sessions. Barbour argues that by identifying himself with the agents, the Attorney improperly borrowed the prestige of those agents. Barbour argues that the Attorney repeatedly mentioned that the witnesses told a different story to government agents to imply that because the agents worked for the government, their recollection was more likely to be the truth than the witnesses' recollection. We are persuaded by the government's explanation that the Attorney used those words as context, to explain to the court and the witnesses to which interviews he was referring. An assistant attorney's cross-examination of a witness with an inconsistent statement would

be of doubtful value if he were not permitted to delineate between conversations by giving the witness more context. May participated in several proffers and at one point during the trial, for clarification, had to ask the Attorney, "Is this the proffer I did with you?" There is no indication that the Attorney was attempting to bolster the government's credibility with those references.

The Assistant Attorney also said, "So I guess the agents got that wrong" when confronting May with an inconsistent statement. Even if the isolated question indirectly implied that the government was more credible than the witness, the question still does not rise to the level of plain error in this case.

Third, Barbour claims that the Assistant Attorney made two improper comments during closing argument about Barbour's failure to testify.

Comments by a prosecutor on a defendant's failure to testify violate the Fifth Amendment guarantee against self-incrimination. Griffin v. California, 380 U.S. 609, 615 (1965). This court looks at whether the prosecutor's language shows a manifest intention to comment on the defendant's failure to testify and whether the jury would naturally and necessarily understand it to be a comment on the defendant's failure to testify. United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996).

In this case, the Assistant Attorney said, "But if you want to really find out what went on, go to the people on the

-14-

inside . . . [t]hose are the only people who laid it out for you." The government contends that the Attorney meant that the conspirators were credible witnesses because their information came from their position inside the conspiracy. That interpretation fails to explain why he said they were "the *only* people who laid it out for you." The Attorney's intention could have been to comment only on the credibility of his witnesses, but this last phrase raises the possibility he was commenting on Barbour's failure to testify or present witnesses. But it seems more likely that he was comparing the insiders to the other witnesses who testified.

The Assistant Attorney's second comment referred to one of Barbour's taped phone conversations. He said, "The best witness in this case I submit to you is Mr. Panasonic. . . . Mr. Panasonic allowed you to listen to this defendant." That comment may also be open to more than one interpretation. Perhaps the Attorney was suggesting only that the taped evidence was the best, most objective evidence in the trial. In closing, the Attorney explained that "Mr. Panasonic has nothing to gain or lose. Mr. Panasonic has not been impeached one iota." On the other hand, "this allowed you to listen to this defendant" arguably might be interpreted as a reminder to the jury that Barbour did not take the stand to explain the taped conversations and as a reminder that the prosecution was the only party who made it possible for the jury to listen to the defendant.

Assuming, arguendo, that the Assistant Attorney's comments are each capable of at least two possible interpretations, one impermissible and one innocent, it would not profit Barbour here. In these situations we have cautioned, "A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning." Wihbey, 75 F.3d at 770 (citations omitted). Nor should we assume the jury will draw from the comments the most damaging meaning. United States v. Newton, 327 F.3d 17, 27 (1st Cir.), cert. denied, 124 S. Ct. 338 (2003). Wihbey reviewed two comments similar to those in Barbour's case. First, the prosecutor mistakenly named the defendants among those who testified; he then said, "You've heard from all of those witnesses except for obviously the two Defendants. . ." Id. at 768. The court agreed that the prosecutor was trying to correct his earlier mistake and the jury would understand his statement as a correction. Id. at 770. Second, the prosecutor stated that defense counsel could not "explain away" a conversation that another witness testified about. Id. at 769. The court categorized that statement as a "how-does-counsel-explain" Griffin violation, but held it was not plain error, stating that the comment did not seriously affect the fairness and integrity of the proceedings for two reasons. Id. at 770-71. First, the jury was instructed on the defendant's right to not testify and on the government's burden of proof, and second, the evidence against the

-16-

defendant was strong, even if not overwhelming.  <u>Id.</u>

Even if the Assistant Attorney intended the comments to be a reference to Barbour's failure to testify, or if the jury believed them to be, the comments did not likely affect the outcome of the trial.  The potential influence of those comments on the jury was mitigated by the jury instructions, which stated that the defendant had no obligation to testify and repeated the government's beyond-a-reasonable-doubt burden seventeen times.  The evidence of Barbour's guilt was strong, although the specific drug quantities and length of the conspiracy were disputed.  If the comments were objectionable, Barbour did not object, and the comments do not rise to the level of plain error.  <u>See, e.g.</u>, <u>United States</u> v. <u>Moran</u>, No. 03-2148, 2004 WL 2900357 (1st Cir. Dec. 15, 2004).

**IV.**

Barbour argues that in sentencing him, the district court erred in its determination of drug quantities, possession of a weapon, criminal history, and obstruction of justice.

Barbour first argues that the district court erred in attributing to him drug quantities that were outside the scope of the charged conspiracy.  In reviewing a district court's application of sentencing guidelines, we review the guideline's legal meaning and scope de novo.  <u>United States</u> v. <u>Caraballo</u>, 200 F.3d 20, 24 (1st Cir. 1999).  We review the court's fact-finding

for clear error, giving due deference to the court's application of the guidelines to the facts.  Id.

Under the sentencing guidelines, a defendant may be held accountable for drug quantities involved in his "relevant conduct." This includes acts committed during the commission of the offense, in preparation, in the course of attempting to avoid detection, or, in some situations, conduct that was part of the same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. § 1B1.3 (2003).  The background section of 1B1.3 authorizes judges to look at conduct beyond the crimes charged in the indictment: "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment: backg'd.  In the context of controlled substances, the background states that "quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level" if they fit within the definition of relevant conduct.  Id.

Barbour's argument is that the government should have charged four separate conspiracies rather than charging a single (1999-2001) conspiracy, and the court should have viewed Barbour's activity before 1999 as a separate conspiracy.  The government provided evidence to support the theory of a single evolving drug conspiracy rather than several discrete and separate conspiracies.

The district court made a factual finding that Barbour was the leader of one single drug conspiracy from 1996 to 2001. We cannot say this finding, which was supported by the record, was clearly erroneous. Barbour's conduct can still be relevant, though it may be outside the time frame of the charged conspiracy. The district court's finding of a single conspiracy from 1996-2001 supports the inclusion of the drug quantities as part of the same course of conduct or common scheme or plan as the offense of conviction. The district court made no legal error in its application of the guidelines. Because Barbour's involvement as early as 1996 is supported by the record, the district court did not err in attributing the drug quantities to Barbour as part of his relevant conduct.

Barbour also argues that the court relied on "unreliable" or "inaccurate" information in attributing to him 360 pounds of marijuana and one kilogram and forty-two ounces of cocaine. Barbour claims the marijuana could only have been part of the conspiracy in 1999, but the district court attributed it to Barbour in 1996. The district court relied on John Ross's testimony, a co-conspirator, whom the court found credible for determining drug quantities, even though he was unable to recall the dates of the drug transactions. Barbour does not claim that the marijuana was counted twice. Whether the transaction occurred in 1996 or 1999 makes little difference because the district court found the

-19-

conspiracy lasted from 1996-2001.

Barry May and Steven Case testified about Barbour's involvement with the cocaine. May testified that he received a kilogram of cocaine in May 2000. He said "they all were involved with it," but that it was either Barbour or Shane Hall who actually sent the cocaine to him. May took some of the cocaine to Kevin Woodward's house to be divided. Case testified that in May 2000, he saw almost a full kilo of cocaine at May's house, and that May told him that Barbour took some of it when he packaged the kilo. Case also testified that Barbour sent him another forty-two ounces of cocaine around the time that Barbour was leaving Texas.

The district court was only required to find by a preponderance of the evidence that these drug quantities were part of Barbour's relevant conduct. United States v. Laboy, 351 F.3d 578, 582 (1st Cir. 2003). The record supports each drug quantity determination, and we find no clear error in the district court's application of the guidelines to the facts.

Barbour additionally argues that the district court did not have sufficient evidence for the weapon enhancement. Witnesses May and Hall testified that Barbour was among a group who went to collect a debt in Houston. The group started from a bar and dropped by Hall's house to get a gun. Hall went inside and returned with a gun, and the group went to collect a drug debt from Case. Barbour admitted they went looking for Case to "rough him

-20-

up."

We upheld a weapon enhancement against May for the same incident. United States v. May, 343 F.3d 1, 7 (1st Cir. 2003). In May, we said that in a conspiracy case, the government must show that one of the defendant's co-conspirators "possessed a weapon during the offense." May, 343 F.3d at 7 (quoting Nelson-Rodriguez, 319 F.3d at 59). Then the burden shifts to the defendant to show the connection between the gun and the drug conspiracy was "clearly improbable." Id. Here, the government showed that Hall, a co-conspirator, took a gun with him on the group expedition to collect on a drug debt owed to Barbour and the other conspirators. Barbour failed to provide evidence that the connection between the drug conspiracy and the gun was "clearly improbable." We affirm the enhancement.

Barbour argues that the district court sentenced him from the wrong criminal history category because the government failed to establish that he was represented by counsel for his previous convictions.

Once the government establishes the existence of a prior conviction, the burden shifts to the defendant to show that the earlier conviction was constitutionally infirm or otherwise inappropriate for consideration. United States v. Gray, 177 F.3d 86, 89 (1st Cir. 1999). For his lack of representation claim, Barbour must have established both that he was uncounseled and that

-21-

he did not waive his right to counsel. Id. at 90. The Presentence Investigation Report, which can be used to satisfy the government's "modest" burden, id. at 89, detailed fifteen of Barbour's prior convictions. Barbour provided state records of his criminal history; some of those records indicate that Barbour was represented and some of them are silent as to representation.

Even if we were to assume those records establish a lack of representation, they still do not show whether Barbour waived his right to counsel. Id. We have said that as the person in the best position to offer details about his own criminal history, a defendant's silence at sentencing can be "deafening." Id. at 90. Here, Barbour testified at sentencing, but failed to testify about whether he was represented in connection with his prior convictions, thus failing to establish the necessary element of failure to waive counsel. The district court did not err in its criminal history determination.

A lengthy discussion of Barbour's challenge to the obstruction of justice enhancement is not necessary. The record is replete with references to support the district court's conclusion.

For the first time after oral arguments, Barbour submitted a letter under Fed. R. App. P. 28(j), calling our attention to Blakely v. Washington, 124 S. Ct. 2531 (2004). Although Blakely stated that it expressed no opinion on the validity of the federal sentencing guidelines, its rationale casts

doubt on their constitutionality, and the Supreme Court has taken the question under advisement. United States v. Del Rosario, 388 F.3d 1 (1st Cir. 2004).

A party cannot normally raise a new issue in a Rule 28(j) filing. United States v. Morgan, 384 F.3d 1, 8 (1st Cir. 2004). A more difficult question is whether this rule should apply when a party is raising a new issue in response to a Supreme Court decision that was issued only after briefing and oral argument. Id. If Barbour merely failed to raise the argument, we can still review for plain error, but if Barbour waived the argument, no review is available. See id. If we assume, in Barbour's favor, that plain error review is available, Barbour's argument does not prevail.

We review the district court's determinations in light of the existing precedent at that time. The district court sentenced Barbour on February 5, 2003, which was more than one year before the Supreme Court decided Blakely. We cannot say that the district court's application of the sentencing guidelines, which occurred before Blakely cast doubt on their constitutionality, was plain error. See, e.g., Del Rosario, 388F.3d at 14-15; Morgan, 384 F.3d at 8.

Barbour's conviction and sentence are affirmed.