# United States Court of Appeals
## For the First Circuit

No. 12-2490

UNITED STATES OF AMERICA,

Appellee,

v.

YAMIL NAVEDO-RAMIREZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

Irma R. Valldejuli for appellant.
Monique T. Abrishami, with whom Rosa Emilia Rodríquez-Vélez,
United States Attorney, Nelson Pérez-Sosa, Assistant United States
Attorney, and Francisco A. Besosa-Martínez, Assistant United States
Attorney, were on brief, for appellee.

March 30, 2015

**LYNCH, Chief Judge**.  This case concerns the jury's rejection of a duress defense after the defendant took the stand. Defendant Yamil Navedo-Ramirez, an 18-year veteran of the Puerto Rico Police Department (PRPD), provided armed protection at a sham drug transaction orchestrated by the FBI as part of a sting operation designed to identify corrupt police officers in Puerto Rico.  She was 37 years old at the time, was divorced, and had two sons, aged 20 and 14.  She was convicted of aiding and abetting an attempt to possess with intent to distribute five kilograms or more of cocaine and possession of a firearm in furtherance of a drug trafficking crime and sentenced to 181 months imprisonment.  The sting operation, "Operation Guard Shack," netted a number of corrupt police officers.  See, e.g., United States v. González-Pérez, 778 F.3d 3 (1st Cir. 2015); United States v. Diaz-Castro, 752 F.3d 101 (1st Cir. 2014); United States v. Delgado-Marrero, 744 F.3d 167 (1st Cir. 2014); United States v. Díaz-Maldonado, 727 F.3d 130 (1st Cir. 2013).

Navedo-Ramirez appeals, arguing that the district court committed various evidentiary errors.  She also argues that the court should have granted her a downward variance in sentencing, alleging, incorrectly, that the government engaged in sentencing factor manipulation.  We affirm her conviction and sentence.

I.

In 2008, the FBI began Operation Guard Shack, aimed at

-2-

combating corruption in the PRPD.  The FBI recruited PRPD officers to work as confidential informants, and the informants invited PRPD officers whom they suspected of corruption to provide armed protection at sham drug transactions staged by the FBI.  Diaz-Castro, 752 F.3d at 104.  The informants often encouraged the officers to recruit other officers into the scheme.  See, e.g., id. at 104-05; Díaz-Maldonado, 727 F.3d at 134-35.

On April 9, 2010, Wendell Rivera-Ruperto, a former romantic partner of Navedo-Ramirez, provided security services for one of the sham drug transactions at an apartment complex in the Isla Verde sector of San Juan, Puerto Rico.  Rivera-Ruperto was informed that if he wanted to continue providing security for the drug deals, he would need to recruit an additional police officer to participate.  He stated that his wife was a police officer and could accompany him to the next transaction.  Later events showed that Rivera-Ruperto, who was unmarried, was referring to Navedo-Ramirez, his ex-girlfriend, who did come with him to the next transaction.

Five days later, on April 14, 2010, Rivera-Ruperto and Navedo-Ramirez arrived at the supposed drug transaction at the apartment complex. Both were armed.  According to a videotape of the transaction, which was played for the jury, and to the testimony of one of the undercover agents who participated in the transaction, Navedo-Ramirez chatted amicably and laughed with the

agents, observed the entirety of the transaction, and escorted the "buyer" of the sham drugs to the door after it was completed. She showed no reluctance to be involved. The undercover officers paid her $2,000 for her services. The agent testified that, after he paid Navedo-Ramirez, he told her that he "like[d] the smell . . . of cocaine and money together," and she laughed. She never tried to report what happened.

Navedo-Ramirez was arrested on September 21, 2010, for her involvement in the April 14, 2010, transaction and charged with (1) conspiracy to possess with intent to distribute over five kilograms of cocaine, see 21 U.S.C. §§ 841(a), 846; (2) aiding and abetting an attempt to possess with intent to distribute over five kilograms of cocaine, see 21 U.S.C. §§ 841(a), 846; and (3) possession of a firearm in furtherance of a drug crime, see 18 U.S.C. § 924(c).

At her May 2012 trial, Navedo-Ramirez took the stand in her own defense. She testified that she had a long history of suffering from domestic abuse by various men, including most recently at the hands of Rivera-Ruperto, with whom she did not live, but had dated. She stated that her relationship with Rivera-Ruperto lasted approximately two months, from August to October 2009. Their relationship was initially amicable, but in mid-October 2009, Rivera-Ruperto became physically and emotionally abusive, and Navedo-Ramirez broke off the relationship shortly

-4-

afterward. In the aftermath of the breakup, Navedo-Ramirez testified, Rivera-Ruperto continued to abuse her, sent her threatening pictures, and threatened to have her and her younger son killed if she insisted on ending the relationship or told anyone about his conduct. In particular, she said, in November 2009, he forced her to drink alcohol and raped her; he later brought a hitman to her house, introduced the hitman to her son, and told the hitman her son's name and that he was "the reason [] for which she lives." Navedo-Ramirez never reported any of this to the police.

Navedo-Ramirez testified that in April 2010, Rivera-Ruperto called her and "insist[ed]" that she accompany him to his sister's house. After initially refusing, she agreed to meet Rivera-Ruperto on April 14. Instead of going to his sister's house, he drove her to the drug transaction. Navedo-Ramirez maintained that she did not know that Rivera-Ruperto was leading her to a drug deal until she arrived at the apartment and saw a duffel bag and several kilos of cocaine. Navedo-Ramirez admitted that she was present at the drug transaction and "[went] along with the game," but she stated that she did so only because she feared for her and her son's lives.

During closing arguments, defense counsel argued that Rivera-Ruperto had forced Navedo-Ramirez to participate in the drug transaction and that Navedo-Ramirez lacked the requisite intent to

be convicted of the crimes charged. The jury acquitted Navedo-Ramirez on the conspiracy charge but found her guilty on the charges of aiding and abetting an attempt to possess with intent to distribute five kilograms or more of cocaine and possession of a firearm in relation to a drug trafficking crime.

On November 16, 2012, the district court sentenced Navedo-Ramirez to 121 months imprisonment as to the drug count and 60 months as to the firearm count, to run consecutively. This appeal followed.

## II.

Navedo-Ramirez argues that the district court erred in refusing to admit into evidence (1) the testimony of Dr. Carol Romey, Navedo-Ramirez's proffered expert on Battered Woman Syndrome (BWS), (2) Rivera-Ruperto's prior domestic violence conviction, and (3) Navedo-Ramirez's PRPD performance evaluations. We review these evidentiary rulings for abuse of discretion. Delgado-Marrero, 744 F.3d at 179 (citing United States v. Pelletier, 666 F.3d 1, 5 (1st Cir. 2011)); United States v. Giambro, 544 F.3d 26, 32 (1st Cir. 2008).

A.      Exclusion of BWS Expert

Navedo-Ramirez sought to introduce the testimony of Dr. Romey, an expert on BWS, who would have testified about the general nature of the syndrome. More specifically, defense counsel sought to have Dr. Romey testify about the impact of domestic abuse on

women generally in order to provide context for the defendant's testimony and possibly explain the potential impact that the history of violence Navedo-Ramirez had experienced may have had on her. Navedo-Ramirez maintains that the testimony was relevant to whether she possessed the requisite intent to commit the crimes charged and to whether she acted under duress. Before defendant testified, the district court agreed that, in general, testimony about the long-term effects of being battered or domestic violence in general could well be relevant in a case where a defendant claimed that she engaged in criminal activity only because she was forced to by an abusive domestic partner. United States v. Ramírez, No. 10-344(PG), 2012 WL 733973, at *3 (D.P.R. Mar. 6, 2012); see generally United States v. Marenghi, 893 F. Supp. 85, 92-97 (D. Me. 1995) (holding that expert testimony on BWS may be admitted to support a duress defense).

After defendant testified, her counsel offered the expert testimony. The court excluded Dr. Romey's testimony, finding that it would not be helpful to the jury because Navedo-Ramirez's testimony had adequately conveyed her contention that she participated in the drug transaction because she feared for her son's life and her own:

> Based on the history that's before the jury as to her treatment by her first husband, her third husband and by [Rivera-Ruperto] . . . . [s]he was fearful of him, the photographs, . . . the pulling of the hair, the punch, whatever, when he said you are going to go

with me, she felt fear and she went with him. That is why she went. You don't need to have a psychologist come in and say, well, a woman who has had all these experiences is going to act not as a reasonable person would act under those situations. She would act based on that fear that she has ingrown into her because of her previous experiences. Therefore, she was there . . . because . . . . [s]he was afraid for herself and her son and that justifies her actions. You don't need a psychologist for that. . . .

. . . .

She was fully articulate on what she felt, . . . what she thought during . . . . She just went there because . . . . [s]he was afraid for her son. If the jury believes that then they would have to acquit, I think . . . . At this time it's a question of credibility. . . .

. . . .

She has testified as to the duress. If you believe that all that she says put her in such a state of mind that she was completely under duress and acted out of duress, we don't need an expert . . . .

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if," among other requirements, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." If a layperson is capable of understanding an issue without the aid of an expert, a district court may properly decline to admit expert testimony on that issue on the ground that it would not be helpful to the jury. See United States v. Salimonu, 182 F.3d 63, 74 (1st Cir. 1999).

The proposed expert testimony did not fit this case snugly. This is not a case in which a battered spouse tries to explain why she continues to live with the batterer. Navedo-Ramirez dated Rivera-Ruperto for two months, and then broke off the relationship. Furthermore, the threats to which Navedo-Ramirez testified were such that any person, unaided by expert testimony, could readily appreciate their impact. To be blunt, any person might well be placed under much duress if her child's life were threatened by a supposed hit man, or if she were raped while involuntarily intoxicated. This is not to say that all of the proposed expert testimony was inadmissible. Instead, it is to say only that we find no abuse of discretion in the district court's ruling that the jury would not be aided by expert testimony in determining whether Navedo-Ramirez acted under duress and whether she had the requisite mens rea for the crimes charged. The real issue in this case was whether the jury accepted her testimony as credible. An expert would not be helpful on that. The government's contention was not that abuse could not produce duress, but that she was not credible in attributing her presence and commission of the crime to duress. The court reasonably concluded that testimony from an expert on BWS would have been cumulative of Navedo-Ramirez's own testimony and, thus, unhelpful to the jury. Cf. United States v. West, 670 F.2d 675, 682 (7th Cir. 1982) (affirming district court's exclusion of expert

testimony regarding defendant's limited intelligence, intended to suggest that defendant did not realize that a gift he had accepted was a bribe, because defendant's "limited intelligence was clearly revealed to the jury during [his] testimony" and accordingly "the jury was able to determine whether [defendant] realized that he was accepting a bribe without the assistance of expert testimony"), overruled on other grounds by United States v. Green, 258 F.3d 683, 690-92 (7th Cir. 2001); United States v. Byers, 730 F.2d 568, 570-71 (9th Cir. 1984) (noting that the district court has "wide latitude in admitting or excluding psychiatric evidence directed to the capacity of a defendant to entertain a specific intent or directed to the credibility of a witness" (citations and internal quotation marks omitted)).

B.       Rivera-Ruperto's Prior Domestic Violence Conviction

Navedo-Ramirez also sought to introduce a prior domestic violence conviction of Rivera-Ruperto.  The district court excluded it as inadmissible propensity evidence.  See Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").  Navedo-Ramirez contends that this was error, arguing that it was relevant to her duress defense.

"A duress defense requires proof that the defendant committed a crime as a result of: '(1) an immediate threat of

-10-

serious bodily injury or death, (2) a well-grounded belief that the threat will be carried out, and (3) no reasonable opportunity to escape or otherwise to frustrate the threat.'" González-Pérez, 778 F.3d at 13 (quoting United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996)). Navedo-Ramirez says that Rivera-Ruperto's domestic violence conviction supported her contention that she had a "well-grounded belief" that his threats against her and her son would be carried out. This argument would have some force, were there any evidence suggesting that she knew about the conviction. Cf. United States v. Willis, 38 F.3d 170, 177 n.8 (5th Cir. 1994) (noting that "the objective situation in which the defendant was allegedly subjected to duress" is relevant to the defense of duress and that "evidence concerning the defendant's past history with the person making the unlawful threat" can help show that the defendant's fear was well-grounded). But there is no such evidence or even an offer of proof in the record. Defense counsel admitted as much at oral argument. Without evidence establishing that Navedo-Ramirez knew about Rivera-Ruperto's conviction, the district court did not err in excluding the conviction. See United States v. Garcia, 729 F.3d 1171, 1178-79 (9th Cir. 2013) (noting that prior violent acts by a purported aggressor could not have affected the defendant's state of mind if the defendant did not know about the violent acts).

C.        <u>Navedo-Ramirez's PRPD Performance Evaluations</u>

We likewise find no abuse of discretion as to the district court's exclusion of Navedo-Ramirez's PRPD performance evaluations.  It is true that Rule 404(a) allows a criminal defendant to offer evidence of a "pertinent" character trait.  <u>See</u> Fed. R. Evid. 404(a)(2)(A).  But the district court permissibly concluded that the character trait that the evaluations purport to show -- general competence at her job as a police officer -- is not "pertinent" to the drug and gun possession crimes of which Navedo-Ramirez was convicted.  <u>See</u> <u>United States</u> v. <u>Washington</u>, 106 F.3d 983, 990, 999 (D.C. Cir. 1997) (affirming district court's refusal to admit under Rule 404(a) commendations defendant had received while on the police force, reasoning that defendant's "'dedication, aggressiveness and assertiveness' in investigating drug dealing and carjacking [was not] 'pertinent' to . . . his supposed lack of predisposition to" provide security for drug transactions); <u>cf.</u> <u>United States</u> v. <u>Nazzaro</u>, 889 F.2d 1158, 1168 (1st Cir. 1989) (finding that commendations received by defendant in military service and as a police officer were not pertinent to defendant's perjury and mail fraud charges).

III.

Finally, we address Navedo-Ramirez's contention that the district court erred in finding no sentencing factor manipulation and so erred in sentencing her by failing to grant a downward

-12-

variance. Sentencing factor manipulation occurred, she maintains, because the government "chose the actors (undercover police officers to act as seller and buyer), the place, the amount and kind of drug that w[ould] be sold, the amount of money to be paid for the security job and the way that the corrupt police officers were to be recruited." She notes that the amount of drugs chosen by the government was sufficient to trigger the statutory minimum sentence of ten years imprisonment, plus a consecutive five-year sentence for possession of a firearm.

"Sentencing factor manipulation occurs where government agents have improperly enlarged the scope or scale of [a] crime." United States v. Lucena-Rivera, 750 F.3d 43, 55 (1st Cir. 2014) (alteration in original) (citations and internal quotation marks omitted). Sting operations are permissible, though they by definition involve manipulation. Id. Accordingly, "'relief for sentencing factor manipulation is reserved for only the extreme and unusual case,'" id. (quoting United States v. Fontes, 415 F.3d 174, 180 (1st Cir. 2005)) (internal quotation marks omitted), such as a situation "involving 'outrageous or intolerable pressure' [by the government] or 'illegitimate motive on the part of the agents,'" United States v. Richardson, 515 F.3d 74, 86-87 n.8 (1st Cir. 2008) (quoting United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995)). A district court's finding as to whether improper manipulation took place is "ordinarily a factbound determination"

that we review for clear error.  Lucena-Rivera, 750 F.3d at 55 (quoting United States v. Gibbens, 25 F.3d 28, 30 (1st Cir. 1994)).

The district court did not clearly err in finding that this was not an "extreme and unusual case."  The main focus of a sentencing factor manipulation claim is impropriety on the part of the government, United States v. DePierre, 599 F.3d 25, 29 (1st Cir. 2010), and there is no compelling evidence of impropriety here, much less the "outrageous or intolerable pressure" required for a finding of manipulation, Montoya, 62 F.3d at 4.[1]  In short,

---

[1]    Navedo-Ramirez has not explicitly argued that a finding of "vicarious" or "derivative" sentencing factor manipulation was required here on a theory that it was Rivera-Ruperto who improperly pressured her into participating in the drug deal.  That argument would not alter the analysis, because Rivera-Ruperto's conduct is not attributable to the government for purposes of a sentencing factor manipulation determination.  In the closely related area of entrapment, we have noted that the conduct of a "middleman" will be attributable to the government only if

> (1) a government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent's actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman's inducement, the targeted defendant in fact engaged in the illegal conduct.

United States v. Luisi, 482 F.3d 43, 55 (1st Cir. 2007).  These conditions are not satisfied here.

"[t]he facts in this case do not show anything beyond the level of manipulation inherent in virtually any sting operation -- and that is not enough to warrant a downward departure."  United States v. Sánchez-Berríos, 424 F.3d 65, 79 (1st Cir. 2005).[2]

IV.

For these reasons, we affirm Navedo-Ramirez's conviction and sentence.

---

[2]    Navedo-Ramirez's reply brief argues that her sentence should be vacated because the district court found sentencing factor manipulation with respect to a purportedly similarly-situated codefendant, José Nieves-Velez.  We note that Nieves-Velez did not testify and was not a police officer.  See United States v. Nieves-Velez, 28 F. Supp. 3d 131, 134-35 (D.P.R. 2014).    The propriety of the court's finding in Nieves-Velez's case is not before us, and it has no bearing on the issue of whether the court clearly erred in finding no sentencing factor manipulation in this case.