THOMPSON, Circuit Judge.
This case arises out of a now-familiar, large-scale FBI investigation known as “Operation Guard Shack,” in which the FBI, in an effort to root out police corruption throughout Puerto Rico, orchestrated a series of staged drug deals over the course of several years.[1] For his participation in six of these Operation Guard Shack drug deals, Defendant-Appellant Wendell Rivera-Ruperto stood two trials and was found guilty of various federal drug and fírearms-related crimes. The convictions resulted in Rivera-Ruperto receiving a combined sentence of 161-years and 10-months’ imprisonment.
Although Rivera-Ruperto raises similar challenges in his appeals from the two separate trials, each trial was presided over by a different district judge. Thus, there are two cases on appeal, and we address the various challenges today in separate opinions.[2] In this present appeal from the first trial, Rivera-Ruperto argues that the district court committed reversible errors when it: (1) denied his claim for ineffective assistance of counsel during the plea-bargaining stage; (2) failed to instruct the jury that it was required to find drug quantity beyond a reasonable doubt; (3) either declined to consider or rejected his sentencing manipulation claim; and (4) sentenced him to a grossly disproportionate sentence in violation of the Eighth Amendment.
For the reasons stated below, we affirm the district court.
OVERVIEW
We keep our summary of the facts brief for now, saving the specific details related to Rivera-Ruperto’s various challenges for our later discussion.
Rivera-Ruperto provided armed security during six Operation Guard Shack sham drug deals, which occurred on April 9, April 14, April 27, June 9, June 25, and September 16 of 2010.[3] Each of the sham deals followed the same pattern. They involved undercover officers posing as sellers and buyers of fake cocaine, and took place at FBI-monitored apartments wired with hidden cameras. The April 9 and April 14 deals each involved 12 kilograms *5 of fake cocaine, the April 27 and June 9 deals each involved 8 kilograms of fake cocaine, and the June 25 and September 16 deals each involved 15 kilograms of fake cocaine. On top of rendering armed security services, Rivera-Ruperto brought along •with him additional recruits.[4] And at the April 27 deal, Rivera-Ruperto did even more; he sold a handgun, including magazines, to a confidential FBI informant posing as a drug dealer. For his services, Rivera-Ruperto received a payment of $2,000 for each of the deals, except for the September 16 deal, for which he received $3,000.
The government charged Rivera-Ruper-to under three separate indictments (two on September 21, 2010 and one on September 23, 2010) for his illegal participation in the six sham drug deals.[5] For each of the transactions, the indictments charged Rivera-Ruperto with one count each of conspiracy and attempt to possess with intent to distribute a controlled substance, as well as possession of a firearm in relation to a drug trafficking crime. Additionally, Rivera-Ruperto was charged with possessing a firearm with an obliterated serial number during the April 27 deal.
Rivera-Ruperto’s case proceeded to trial after plea negotiations with the government failed — a point of contention that we get to shortly. For purposes of trial, the first September 21 indictment (which charged Rivera-Ruperto for the April 14, April 27, June 9, and June 25 deals) and the September 23 indictment (which charged him for the September 16 deal) were consolidated and tried together. A jury found Rivera-Ruperto guilty of all charges and the district judge sentenced him to 126-years and 10-months’ imprisonment. It is this first trial which is the topic of the present appeal. As we discuss in more detail below, Rivera-Ruperto takes issue both with the judge’s jury instructions and with the sentence he ultimately received.
Over defense counsel’s objections, the second September 21, 2010 indictment (which charged Rivera-Ruperto for his involvement in the transaction on April 9, 2010 only) was tried several months later before a different district judge. After a second jury found Rivera-Ruperto guilty on all counts, Rivera-Ruperto received a 35-year sentence of imprisonment.
Rivera-Ruperto, who is presently serving his combined sentence of 161 years and 10 months, now timely appeals. Putting aside, as we are required to do, whatever misgivings we might have as to the need for or the wisdom in imposing a near two-life-term sentence to punish a crime that involved staged drug deals, sham drugs, and fake dealers, we turn to the task of assessing whether any of Rivera-Ruperto’s legal arguments entitle him to relief. As we have already noted, we address only Rivera-Ruperto’s challenges from his first trial, saving those from the second for discussion in our separate, related opinion.
DISCUSSION
I. Lafler Motion
Rivera-Ruperto first challenges the district court’s denial of his claim that his *6 first court-appointed attorney provided ineffective assistance at the plea-bargaining stage. We begin by recounting what happened below.
A. Background
About a month after Rivera-Ruperto was arraigned, the government made him an initial plea offer of 14 years that covered the charged offenses in all three indictments. Rivera-Ruperto’s first court-appointed attorney, Jose Aguayo (“Aguayo”), successfully negotiated that offer down to 12 years. When Rivera-Ruperto refused to take the 12-year deal, Aguayo attempted to negotiate an even lower sentence, but the prosecution told Aguayo that its 12-year offer was final.
Aguayo then showed Rivera-Ruperto the email, which spelled out the government’s final offer of 12 years, and explained to him the repercussions of not taking the plea deal. But Rivera-Ruperto rejected the offer still, and directed Aguayo to make a counteroffer of 8 years instead. Unsurprisingly, the government refused the 8-year counteroffer.
In a last-ditch effort, Aguayo joined defense attorneys for five other Operation Guard Shack defendants to attempt to negotiate a global plea deal for the six defendants as a group. The government responded to these overtures by renewing its 12-year offer for Rivera-Ruperto, but this time the offer had an expiration date. When Aguayo showed Rivera-Ruperto the renewed offer, Rivera-Ruperto, once again, rejected it. The offer lapsed on February 4, 2011. Accordingly, on February 7, 2011, the government filed an informative motion, in which it notified the court that plea negotiations had terminated and that a trial schedule needed to be set.
On that same day, Aguayo, apparently alarmed by Rivera-Ruperto’s behavior during their meetings regarding the plea negotiations, filed a request for a psychiatric exam for Rivera-Ruperto. In the motion, Aguayo stated that during their meetings, he had witnessed Rivera-Ruperto “exhibiting strange behavior which has progressively worsened,” and that Rivera-Ruperto “refuses to, or lacks the ability to appreciate the seriousness of his case, refuses to review the discovery material, appears to lose his lucidity, rants and raves, and vehemently argues with imaginary people in the attorney-client visiting room.” The district court granted the motion by electronic order.
Shortly after being examined in early June 2011, Rivera-Ruperto sent Aguayo an email, in which he stated that he wanted to take the (by then, already expired) 12-year plea offer. Aguayo responded by advising Rivera-Ruperto that the 12-year deal had timed out, and that they should await the results of the mental evaluation before resuming further plea negotiations. If he were to withdraw the request for the psychiatric examination before they saw the results, Aguayo explained, Rivera-Ruperto could later argue, even after accepting an offer, that he had not been mentally competent to accept it after all.
When the results of the psychological exam came back in late June, the report deemed Rivera-Ruperto “stable” and contained no diagnoses for mental disorders that would affect Rivera-Ruperto’s competency to stand trial.[6] As promised, Aguayo then reached out to the government to attempt to reopen plea negotiations. At first, it appeared the government would be unwilling to engage in further plea bar *7 gaining with Rivera-Ruperto, whom the government believed had shown himself to be a “malingerer.” But Aguayo was insistent that it was not Rivera-Ruperto -who had requested the psychological exam as a delay tactic, but Aguayo himself who had requested it, compelled by his duty to provide Rivera-Ruperto with effective assistance of counsel. After some back and forth, the government relented and agreed to entertain one, and only one more counteroffer from Rivera-Ruperto, but it warned that the counteroffer had to be “substantial” (specifically, somewhere in the ballpark of 20-23 years).
Aguayo met with Rivera-Ruperto to relay this information, making clear that this was their last chance to make a counteroffer, and that a proposal of less than 20 years would not be considered. Despite this advice, Rivera-Ruperto insisted that Aguayo make a counteroffer of only 13 years. Unsurprisingly, the government again rejected this lowball, but nevertheless made one final offer of 18 years. Rivera-Ruperto said no, and then proceeded to fire Aguayo. With plea negotiations over (this time for good), the case was slated for trial.
On March 23, 2012, nine months after the date of the psychological evaluation report and three days before trial was to begin, Rivera-Ruperto, through his second court-appointed attorney, filed a motion alleging that Aguayo had provided ineffective assistance of counsel at the plea-bargaining stage and asking the district court to Order the government to reoffer the 12-year deal. The district court granted Rivera-Ruperto’s request for an evidentiary hearing on the issue and, after hearing testimony from both Rivera-Ruperto and Aguayo and considering the documentary evidence,[7] the district court concluded there was no merit to the ineffective assistance of counsel claim, and denied Rivera-Ruperto’s motion. Rivera-Ruperto says this was error.
B. Analysis
We review a district court’s determination of ineffective assistance of counsel claims de novo and any findings of fact for clear error. Ortiz-Graulau v. United States, 756 F.3d 12, 17 (1st Cir. 2014).
A defendant’s Sixth Amendment right to competent counsel extends to the plea-bargaining process. Lafler v. Cooper, 566 U.S. 156, 132 S.Ct. 1376, 1380-81, 182 L.Ed.2d 398 (2012). A defendant claiming, as Rivera-Ruperto does here, that counsel’s assistance was ineffective at the plea-bargaining stage, must meet the two-part test laid out in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Lafler, 132 S.Ct. at 1384. He must show, first, that counsel’s performance was deficient, and second, that “the outcome of the plea process would have been different with competent advice.” Iff
Rivera-Ruperto argues that he meets both of these prongs. He contends that he “wanted to accept the 12-year plea offer, and would have san§ his original defense counsel’s decision to seek an unnecessary psychological evaluation, his related erroneous advice, and his refusal to inform the government and the district Court of [his] decision [to accept the 12- *8 year offer].”[8] But this argument fails on both Strickland requirements. To start, Rivera-Ruperto has failed to establish that Aguayo’s performance was defective.
In order to meet the first Strickland prong, a defendant must show that “counsel’s representation fell below an objective standard of reasonableness.” Strickland, 466 U.S. at 688, 104 S.Ct. 2052. Generally speaking, “counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.” Id. at 690, 104 S.Ct. 2052. Thus, in order to establish deficient performance, a defendant must show that, “given the facts known at the time, counsel’s choice was so patently unreasonable that no competent attorney would have made it.” Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010) (citing Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006)).
Here, none of Aguayo’s actions meets this standard. Aguayo sought a psychological exam only after he observed Rivera-Ruperto arguing with imaginary people and exhibiting other abnormal behavior. While ultimately the results of Rivera-Ruperto’s exam may have shown that Rivera-Ruperto did not have any mental health issues, given the erratic behavior Rivera-Ruperto displayed during their meetings, Aguayo’s motion was not “patently unreasonable.” Tevlin, 621 F.3d at 66 (citation omitted).[9]
Nor do we think Aguayo’s performance was deficient on account of the fact that he advised Rivera-Ruperto to await the re-suits of the psychological exam before pursuing further plea negotiations. First, as we get to in a moment, by the time Rivera-Ruperto had emailed Aguayo to say he wished to take the 12-year plea offer, there was no actual offer for Rivera-Ruperto to take because the last 12-year deal had expired some three or four months prior. But even if there had been a live offer on the table, by the time Rivera-Ruperto expressed any interest in taking a 12-year plea deal, he had already been examined and was awaiting the results. As Aguayo explained to Rivera-Ruperto at the time, it was Aguayo’s professional judgment that withdrawing the motion for the psychological exam at that point would threaten the durability of any plea agreement they might have reached because Rivera-Ru-perto could later argue that he had not been mentally competent to enter into the deal at all. We think this advice was given in the exercise of reasonable professional judgment, and in any event, certainly was not so deficient as to fall below “an objective standard of reasonableness.” Strickland, 466 U.S. at 688, 104 S.Ct. 2052. Rivera-Ruperto has therefore failed to show that Aguayo’s performance was deficient.
Moreover,- even if we were to assume the defective performance prong has been met, Rivera-Ruperto’s claim still fails because he cannot show the necessary prejudice to meet the second Strickland prong. In order to establish prejudice, a defendant claiming ineffective assistance at the plea bargaining stage must show that “but for the ineffective advice of counsel *9 there is a reasonable probability that the plea offer would have been presented to the court[,] ... the court would have accepted its terms, and that the conviction or sentence, or both, under the offer’s terms would have been less severe than under the judgment and sentence.” Lafler, 132 S.Ct. at 1385. Rivera-Ruperto cannot do so here.
Rivera-Ruperto argues that he would have accepted the 12-year deal but for Aguayo requesting an “unnecessary and unwanted” psychological exam and then refusing to withdraw the request after Rivera-Ruperto told Aguayo that he wished to accept the 12-year offer. But the facts simply do not bear out Rivera-Ruper-to’s theory that Aguayo’s actions are what prevented a 12-year plea deal from being presented to the court. When Rivera-Ru-perto emailed to tell Aguayo that he wanted to take the 12-year plea offer, it was already early June 2011. By that time, nearly four months had passed since the 12-year plea offer had expired. It was therefore not the requested psychological examination that caused Rivera-Ruperto to “lose” a 12-year plea deal, but the fact that he had already rejected the offer (more than once, we might add), leaving no deal on the table for Rivera-Ruperto to accept. Furthermore, even after the results came back from Rivera-Ruperto’s psychological exam and the government had labeled him a “malingerer,” Rivera-Ruperto had a final opportunity to accept an 18-year plea offer from the government. Rivera-Ruperto rejected even this offer and opted for trial. Rivera-Ruperto has thus failed to show that there is a reasonable probability that any plea deal, much less the 12-year plea deal specifically, would have been presented to the court but for Aguayo’s purported ineffective assistance.
Because Rivera-Ruperto has failed to show that Aguayo’s performance was defective, and because, even if we were to assume the performance was defective, Rivera-Ruperto has failed to show the requisite prejudice, we affirm the district court’s ruling on the Lafler claim.
II. Jury Instructions
Rivera-Ruperto raises on appeal only one challenge concerning the trial itself. He argues that the district court erred in failing to instruct the jury that it Was required to make its drug quantity findings beyond a reasonable doubt. We begin once more with a discussion of what happened below.
A. Background
After closing arguments were made, the trial judge gave jury instructions, beginning with general instructions, which explained that the prosecution had the burden “to prove guilt beyond a reasonable doubt.” The trial judge then instructed the jury on the elements of the crimes with which Rivera-Ruperto was charged.
As a reminder, among other charges, Rivera-Ruperto was indicted for each of the five drug deals with one count each of two drug crimes: conspiracy and attempted possession with intent to distribute a controlled substance. As they are the only instructions relevant to our inquiry today, we focus our attention on the judge’s instructions regarding drug quantity.
The judge instructed the jury as to the elements of the two drug offenses, and was explicit that in order to find the defendant guilty, the jury had to be convinced that the government had proven each element beyond a reasonable doubt. The judge did not include drug quantity among these elements, but after explaining the elements of the drug crimes, the judge did tell the jury: “If you find that the defendant conspired or attempted to possess with intent to distribute a controlled substance[,] ... *10 you will be asked to also make findings as to the quantity of this substance that the defendant either conspired or attempted to possess.”
The trial judge referred to drug quantity one other time in his jury instructions. This was when he described the verdict forms to the jury, explaining: “[I]f you find [the] [defendant guilty, then you are also asked to provide the amount of drugs involved in said count. And there’s a question for you to find that.”[10]
■ Rivera-Ruperto’s trial attorney raised no objections to the jury instructions. After deliberations, the jury returned a verdict in which it found Rivera-Ruperto guilty of all charges. With respect to the drug-related offenses, the jury found Rivera-Ruperto guilty “[i]n the amount of five kilograms or more” for each of the counts, with the exception of the attempted possession count for the September 16 deal, for which the jury did not return a drug quantity finding.[11]
At sentencing, the district court imposed a sentence for these drug convictions that was based on the jury’s drug quantity findings. Specifically, because the jury had found that all of Rivera-Ruperto’s drug offenses (except the September 16 attempted possession count) involved 5 kilograms or more of a controlled substance, the court imposed concurrent sentences of 21-years and 10-months’ imprisonment for each of these convictions.[12] The sentences thus exceeded the 20-year statutory maximum for offenses involving an indeterminate quantity of drugs, see 21 U.S.C. § 841(b)(1)(C), and instead fell within the minimum 10-year to maximum life sentencing range for offenses involving 5 kilograms or more of a controlled substance, id. § 841(b)(1)(A).
On appeal, Rivera-Ruperto argues that he is entitled to a new trial because the district court failed to instruct the jury that it was required to find the drug quantities beyond a reasonable doubt.
B. Analysis
We typically review jury instruction challenges de novo, but where, as here, a defendant failed to object to the jury instructions below, our review is for plain error. United States v. Delgado-Marrero, 744 F.3d 167, 184 (1st Cir. 2014).
Reversal under the plain error standard requires: (1) that an error occurred; (2) that the error was obvious; (3) that it affected the defendant’s substantial rights; and (4) that it threatens the fairness, integrity or public reputation of the proceedings. Delgado-Marrero, 744 F.3d at *11 184. We have noted previously that “[t]his multi-factor analysis makes the road to success under the plain error standard rather steep; hence, reversal constitutes a remedy that is granted sparingly.” United States v. Gelin, 712 F.3d 612, 620 (1st Cir. 2013).
We begin with the question of error. To satisfy plain error review, we must conclude not only that the district court erred in not instructing the jury that it was required to find drug quantity beyond a reasonable doubt, but that the error was obvious.
The Supreme Court has held that facts such as drug quantity are to be considered elements of the offense and must be found beyond a reasonable doubt if those facts “increase the penalty for a crime beyond the prescribed statutory maximum,” Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), or increase the mandatory minimum sentence for a crime, Alleyne v. United States, — U.S. —, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). In this case, it is clear that drug quantity was an element of Rivera-Rupérto’s charged drug offenses because the drug quantity findings increased Rivera-Ruperto’s sentence beyond the statutory maximum for undetermined drug quantities. At trial, the judge did submit the drug quantity question to the jury, and also instructed the jury that the government was required to prove each element of the drug offenses beyond a reasonable doubt. But he never instructed the jury that drug quantity was an element of the drug crimes, nor did he ever state explicitly that drug quantity had to be found beyond a reasonable doubt. The question we must answer, then, is whether the jury nonetheless would have understood that it was required to apply the beyond-a-reasonable-doubt standard to its findings on drug quantity. We conclude that it did, and that the court therefore did not commit obvious error.
In United States v. Barbour, 393 F.3d 82, 89 (1st Cir. 2004), a case involving similar facts, the district court failed, much like the court in this case, to instruct the jury that drug quantity was an element of the offense, although it should have done so. We concluded, however, that this failure did not constitute obvious error because the jury had been “clearly instructed that the defendant’s guilt must be proven beyond a reasonable doubt” and subsequently told, albeit separately, that, if the jury found the defendant guilty, it would be required to make a drug quantity finding. Id. We reasoned that the instructions, while not perfect, sufficiently “connected that burden of proof to the drug quantity determination.” Id. In addition, as in the present case, the verdict form contained a multiple-choice drug quantity question that immediately followed the question regarding the defendant’s guilt. Id Under those circumstances, we concluded that the district court had not committed plain error. Id.
Likewise, here, although the judge never instructed the jury that it was required to make its drug quantity findings beyond a reasonable doubt (though, we stress, he should have), he correctly submitted the drug quantity question to the jury, instructed the jury more than once as to the government’s beyond-a-reasonable-doubt burden, and instructed the jury that if it found Rivera-Ruperto guilty of a drug offense, it would also be required to make a drug quantity finding. Furthermore, on the verdict form, after each question that asked whether the jury found Rivera-Ru-perto “guilty” or “not-guilty” of a drug-related offense, a question directing the jury to make a multiple-choice finding as to drug quantity immediately followed. Thus, the “link between the burden of *12 proof and the jury’s quantity determination,” id. at 89, was at least as close here as it was in Barbour.
In arguing that the district court nonetheless committed plain error, Rivera-Ru-perto relies on Delgado-Marrero, a case in which, applying plain error review, we remanded for resentencing on the basis of an Alleyne error. 744 F.3d at 186-90. In Delgado-Marrero, however, the district court had submitted drug quantity to the jury as a special verdict question only after the jury had already deliberated and returned its guilty verdict. Id. 186-87. The court never directed the jury to apply the beyond-a-reasonable-doubt standard to the special verdict question, nor did it instruct the jury that drug quantity was an element of the drug offense. Id. at 187. Under those circumstances, “given the timing and manner in which the [drug quantity] question was presented,” we reasoned that we could not find that the jury was “sufficiently put on notice of [the drug quantity question’s] critical import to this case.” Id. Because the jurors “had no cause to understand the special verdict question as involving another element of the offense,” we concluded that the court had obviously erred. Id
By contrast, here, as we have already noted, drug quantity was submitted to the jury in the initial jury instructions and on the verdict form, and the court explicitly instructed the jury that the government was required to prove its case beyond a reasonable doubt. Therefore, Rivera-Ru-perto has not cleared the obvious-error hurdle.
■ Moreover, even if we assumed that the district court’s error was obvious and that it affected the defendant’s substantial rights,[13] reversal still would not be warranted because Rivera-Ruperto cannot show that the error was sufficiently fundamental to threaten the fairness, integrity, or public reputation of the proceedings. See id. at 184. The evidence in this case that each of the. staged drug deals involved more than 5 kilograms of sham cocaine was “overwhelming” and “essentially un-controverted,” which gives us no basis for concluding that the judicial proceedings were so affected. United States v. Cotton, 535 U.S. 625, 633, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (holding that the fourth plain-error-review requirement cannot be met where the evidence of an element was “overwhelming” and “essentially uncontro-verted” at trial) (quoting Johnson v. United States, 520 U.S. 461, 470, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).
At trial, the government showed the jury video footage from each of the charged drug deals of a confidential informant weighing the bricks of sham cocaine, and then Rivera-Ruperto placing each brick into a suitcase. The same confidential informant also testified on the stand as to the number of kilograms of sham cocaine that were used during each deal. No conflicting evidence emerged at trial that might have possibly called into question the government’s drug quantity evidence, and Rivera-Ruperto does not provide any argument on appeal as to how we might conclude that, given the evidence presented, any error on the district court’s part threatened the fairness, integrity, or public reputation of his trial.
Let us be clear: we think the district court’s jury instructions were flawed, and *13 that the judge should have instructed the jury that it was required to make its drug quantity findings beyond a reasonable doubt. But, as Rivera-Ruperto has not succeeded in climbing the steep road of plain error review, we cannot reverse.
III. Sentencing Challenges
Rivera-Ruperto’s remaining two arguments are challenges to his sentence. He argues that the government engaged in improper sentencing manipulation when it set up the sting operation, and also that his resulting combined sentence between the two trials of 161 years and 10 months violated the Eighth Amendment’s prohibition on cruel and unusual punishment. We begin for a final time by recounting what happened below.
A. Background
At the beginning of Rivera-Ruperto’s sentencing hearing, defense counsel raised the issue of sentencing manipulation, arguing that the FBI had arbitrarily chosen to use “large” amounts (more than 5 kilograms) of sham cocaine for the sole purpose of enhancing Rivera-Ruperto’s sentencing exposure. Defense counsel argued that, for each of the staged drug transactions, the elements of the charged offenses would have been fulfilled with lesser amounts of sham cocaine, and that the FBI’s decision to use the 8-kilogram, 12-kilogram, and 15-kilogram quantities could only have been for purposes of “mere sentencing enhancement.”
Defense counsel also argued that the government’s charging practices constituted impermissible sentencing manipulation because the series of five drug deals could have been charged as a single drug conspiracy, in which case Rivera-Ruperto would have been convicted of just one count, of possession of a firearm in violation of 18 U.S.C. § 924(c), an offense that carries with it a mandatory minimum sentence of 5 years imprisonment, id. § 924(c)(1)(A). Instead, the government chose to charge each drug deal as a separate transaction, counsel contended, fully knowing that each “second or subsequent” conviction under the subsection carries with it a mandatory minimum sentence of 25 years imprisonment, id. § 924(e)(l)(C)(i), which must be served consecutively, id. § 924(e)(l)(D)(ii). As a result, Rivera-Ruperto’s sentencing exposure in the first trial was 105-years imprisonment for the firearms convictions alone.
The government argued that there had been no improper conduct on its part. Each staged drug deal had in fact been a separate event, involving varying amounts of sham cocaine. And Rivera-Ruperto had decided each time to participate voluntarily, without regard to the amount involved.
After hearing from both sides, the district court, without making an explicit ruling on the sentencing manipulation argument, imposed the following sentence. For all but one of the drug convictions, the district court sentenced Rivera-Ruperto to concurrent 21-year and 10-month terms of imprisonment.[14] For the remaining attempted possession conviction (for which the jury had not returned a drug quantity finding), the district court sentenced Rivera-Ruperto to a term of 20 years (the statutory maximum where the amount of drugs involved is undetermined). The district court also sentenced Rivera-Ruperto to 5-years’ imprisonment for his conviction for possession of a firearm with an obliter *14 ated serial number during the April 27 drug deal. This 5-year sentence was to run concurrently with the 21-year-and-10-month and 20-year drug sentences.
As for the other firearms counts, the district court imposed a 105-year sentence based on the mandatory 5-year minimum term for the first conviction under 18 U.S.C. § 924(c), and four consecutive 25-year mandatory minimum terms for the four subsequent § 924 convictions. In total, Rivera-Ruperto was sentenced to 126-years and 10-months’ imprisonment from the first trial.
Rivera-Ruperto was then also convicted of all counts at his second trial, and the second judge imposed a sentence of 35-years’ imprisonment, to be served consecutively to his first sentence. This brought Rivera-Ruperto’s combined sentence for his participation in six fake drug deals to 161-years and 10-months’ imprisonment.
Rivera-Ruperto now appeals the sentencing manipulation issue and raises an Eighth Amendment challenge to the total length of his sentence.
B. Sentencing Manipulation
Sentencing factor manipulation occurs “where government agents have improperly enlarged the scope or scale of [a] crime.” United States v. Lucena-Rivera, 750 F.3d 43, 55 (1st Cir. 2014) (alteration in original) (quoting United States v. Fontes, 415 F.3d 174, 180 (1st Cir. 2005)). Where the government engages in such manipulation, we “recognize[] the court’s power to impose a sentence below the statutory mandatory minimum as an equitable remedy.” Fontes, 415 F.3d at 180.
Rivera-Ruperto begins his sentencing manipulation appeal by arguing that the district court neglected to address his properly-raised sentencing manipulation objection at all, and that this alone constitutes clear error and warrants reversal. We address this threshold argument first.
It is true that the sentencing hearing transcript reflects that the district court never made an explicit ruling on Rivera-Ruperto’s sentencing manipulation objection. However, the transcript also plainly indicates that at the hearing, the judge invited defense counsel to make any statements he wished. After defense counsel argued the sentencing manipulation issue, the judge thanked him, acknowledging that he had heard the argument, and then, after allowing Rivera-Ruperto himself to speak, invited the government to respond. The judge gave the government ample timé to argue the sentencing manipulation issue as well, and then thanked the government lawyer before imposing the sentence.
Based on the transcript, we think it evident that the judge effectively denied the sentencing manipulation objection when he chose not to deviate from the statutory mínimums in sentencing Rivera-Ruperto for his crimes. This appears to have been clear enough to defense counsel as well, because counsel raised no objection and asked for no clarification as to the judge’s ruling on the sentencing manipulation issue, even when the judge invited counsel to speak after he imposed the sentence.[15] In the face of such an extraordinary sentence, the district court should have taken the time to explain why it concluded that the doctrine of sentencing factor manipulation did not warrant relief, rather than leave it for this court to draw the necessary inferences, but we neverthe *15 less conclude that the judge effectively denied Rivera-Ruperto’s sentencing manipulation claim, and we turn to its merits.
Because “[b]y definition, there is an element of manipulation in any sting operation,” we reserve relief for sentencing factor manipulation only for “the extreme and unusual ease,” Lucena-Rivera, 750 F.3d at 55 (alteration in original) (quoting Fontes, 415 F.3d at 180), such as those situations “involving outrageous or intolerable pressure [by the government] or illegitimate motive on the part of the agents,” United States v. Navedo-Ramirez, 781 F.3d 563, 580 (1st Cir. 2015) (alteration in original) (quoting United States v. Richardson, 515 F.3d 74, 86 n.8 (1st Cir. 2008)). It is the defendant who bears the burden of establishing sentencing factor manipulation by a preponderance of the evidence, and a district judge’s “determination as to whether improper manipulation exists is ordinarily a factbound determination subject to clear-error review.” United States v. Gibbens, 25 F.3d 28, 30 (1st Cir. 1994).
Here, Rivera-Ruperto argues, as he did below, that the government engaged in sentencing manipulation by using unnecessarily high quantities of sham drugs during the deals, by requiring Rivera-Ruperto to bring a firearm with him to each of the deals, and then by allowing him to participate in a “seemingly endless” number of those deals.[16] The government’s only reason for structuring the sting operation in this way, he says, was to inflate his eventual sentence.
But Rivera-Ruperto has not met his burden to show by a preponderance of the evidence that the government’s motivations were indeed improper. At trial, FBI agents testified that the government used large quantities of sham cocaine for the purpose of ensuring that the staged deals looked realistic enough to warrant the need for armed security. Although it is certainly feasible that, as Rivera-Ruperto argues, the agents could have used some lesser quantity of drugs and still made the deals look realistic, the mere fact that they did not, without more, does not establish that the agents engaged in the kind of “extraordinary misconduct,” United States v. Sánchez-Berríos, 424 F.3d 65, 78-79 (1st Cir. 2005), that is required of a successful sentencing manipulation claim.
Likewise, it was a part of the sting operation’s design from the get-go that Operation Guard Shack would “hire” corrupt law enforcement officers to provide armed security at the staged drug deals, and that those officers would then, in turn, be asked to recruit others to participate in subsequent deals, thereby unwittingly assisting the sting in ferreting out additional corrupt officers.[17] Rivera-Ruperto has provided no evidence to suggest that, in tell *16 ing him to bring a firearm to the deals or in allowing him to participate in multiple deals, the FBI agents engaged in “anything beyond the level of manipulation inherent in virtually any sting operation” or “lure[d] the appellant[] into committing crimes more heinous than [he was] predisposed to commit.” Sánchez-Berríos, 424 F.3d at 79.
Moreover, these same arguments have already been attempted and lost by other Operation Guard Shack defendants. See Navedo-Ramirez, 781 F.3d at 570 (denying defendant’s argument that government’s use of high drug quantities constituted sentencing factor manipulation); Lucena-Rivera, 750 F.3d at 55 (rejecting the defendant’s argument that the government had prolonged its investigation for a year in order to inflate the sentence, where the government argued that it had done so to identify other conspirators, and the defendant did not otherwise present sufficient evidence of an improper motive); Sánchez-Berríos, 424 F.3d at 78-79 (denying defendant’s argument that the government connived to make him bring his firearm to the deal in order to enhance his sentencing exposure). The district court therefore did not clearly err in denying Rivera-Ruper-to’s sentencing manipulation claim.
C. Eighth Amendment
Rivera-Ruperto’s final argument on appeal is an Eighth Amendment challenge to his sentence. Rivera-Ruperto argues that his combined sentence between the two trials for 161-years and 10-months’ imprisonment constitutes cruel and unusual punishment. We assume, favorably to Rivera-Ruperto, that this Eighth Amendment argument was properly preserved, and review his challenge de novo.[18]
Let us begin by acknowledging that Rivera-Ruperto’s 161-year and 10-month sentence is indeed extraordinarily long. But in order to deem it constitutionally infirm under the Eighth Amendment’s cruel and unusual punishment clause, there are three criteria we must assess: “(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.” United States v. Polk, 546 F.3d 74, 76 (1st Cir. 2008) (quoting Solem v. Helm, 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)). We reach the last two criteria only if we can first establish that the sentence, on its face, is grossly disproportionate to the crime. Id
To quickly sketch out the underpinnings for Rivera-Ruperto’s sentence once more, of the combined 161 years and 10 months to which Rivera-Ruperto was sentenced, the lion’s share of the sentence — 130 years to be exact — was the result of minimum sentences required by statute for *17 Rivera-Ruperto’s six firearms convictions under 18 U.S.C. § 924(c)(1)(C) (5 years for his first § 924 conviction, and 25-year consecutive sentences for each of the five subsequent convictions).[19] Because Rivera-Ruperto bases his Eighth Amendment challenge on the length of his sentence in its totality, in order to prevail, he must establish that this statutorily-mandated 130-year sentence is grossly disproportionate on its face.[20] Thus, we focus our inquiry here on the portion of his sentence stemming from the § 924(c) convictions.
In noncapital cases, the Eighth Amendment “does not require a precise calibration of crime and punishment.” United States v. Graciani, 61 F.3d 70, 76 (1st Cir. 1995). Rather, “[a]t most, the Eighth Amendment gives rise to a ‘narrow proportionality principle,’ forbidding only extreme sentences that are significantly disproportionate to the underlying crime.” Id. (quoting Harmelin v. Michigan, 501 U.S. 957, 997, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J.)). We have previously remarked that “instances of gross disproportionality will be hen’s-teeth rare.” Polk, 546 F.3d at 76. The Supreme Court has upheld against disproportionality challenges, for example, a sentence of 25 years to life under California’s “three strikes law” for the theft of golf clubs, Ewing v. California, 538 U.S. 11, 30-31, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), and a sentence of 40 years for possession with intent to distribute nine ounces of marijuana, Hutto v. Davis, 454 U.S. 370, 370-74, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (per cu-riam).
The dissent here argues that in those cases where the Supreme Court has upheld harsh sentences for seemingly minor crimes, the Court’s rationale was justified because the offenders were recidivists and recidivism is a legitimate basis on which a legislature can elect to sentence more harshly. However, we see no reason why recidivism may be deemed such a legitimate basis, but crimes involving the combination of drugs and weapons — like those targeted by the § 924(c) stacking regime— may not also be deemed a legitimate basis. To the contrary, “[t]he Supreme Court has noted that the ‘basic purpose’ of § 924(c) is ‘to combat the dangerous combination of drugs and guns’ ” and “has also noted that ‘the provision’s chief legislative sponsor ... said that the provision seeks to persuade the man who is tempted to commit a Federal felony to leave his gun at home.’ ” United States v. Angelos, 433 F.3d 738, 751 (10th Cir. 2006) (quoting Muscarello v. United States, 524 U.S. 125, 126, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998)).
Defendants have a particularly difficult time passing through the proportionality principle’s narrow channel where the sentence is the result of a statutory mandate. This is because courts are required to give deference to the judgments of the legislature in determining appropriate punishments, and must “step softly and cede a wide berth to the Legislative Branch’s authority to match the type of punishment with the type of crime.” Polk, 546 F.3d at 76; see also Harmelin, 501 U.S. *18 at 998, 111 S.Ct. 2680 (“[T]he fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter is ‘properly within the province of legislatures, not courts.’ ” (quoting Rummel v. Estelle, 445 U.S. 263, 275-76, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980))). Accordingly, “[n]o circuit has held that consecutive sentences under § 924(c) violate the Eighth Amendment.” United States v. Robinson, 617 F.3d 984, 991 (8th Cir. 2010) (alteration in original) (quoting United States v. Wiest, 596 F.3d 906, 912 (8th Cir. 2010)): For example, courts have upheld against Eighth Amendment challenges such sentences as a 107-year and 1-month sentence for a defendant’s five § 924(c) convictions, United States v. McDonel, 362 Fed.Appx. 523, 530 (6th Cir.), cert. denied, 562 U.S. 1061, 131 S.Ct. 636, 178 L.Ed.2d 477 (2010); a 132-year and 1-day sentence, of which 125 years were for § 924(c) convictions, United States v. Ezell, 265 Fed.Appx. 70, 72 (3d. Cir. 2008); a 147-year and 8-month sentence based, in large part, on a defendant’s six § 924(c) convictions, United States v. Watkins, 509 F.3d 277, 282 (6th Cir. 2007); and a 155-year sentence for seven § 924(c) convictions, United States v. Hungerford, 465 F.3d 1113, 1117-18 (9th Cir. 2006), cert. denied, 550 U.S. 938, 127 S.Ct. 2249, 167 L.Ed.2d 1097 (2007). Rivera-Ruperto has not presented any contrary authority upon which we might base a departure from our sister circuits’ holdings here.
At oral argument, counsel for Rivera-Ruperto argued that we should be swayed by the fact that, in this case, the crime involved fake drug deals. A near two life-term punishment where no real drugs and no real drug dealers were involved, he contended, is a punishment that is grossly disproportionate on its face. But in coming to this sentence, the judge below was guided by and correctly employed a sentencing scheme that is written into statute — a statute that makes no distinction between cases involving real versus sham cocaine. At each of the six stings, in fact, Rivera-Ruperto repeatedly and voluntarily showed up armed and provided security services for what he believed to be illegal transactions between real cocaine dealers. The crime of possessing a firearm in furtherance of such a drug trafficking offense is a grave one, and Congress has made a legislative determination that it requires harsh punishment. Given the weight of the case law, we see no Eighth Amendment route for second-guessing that legislative judgment.
We thus cannot conclude that Rivera-Ruperto has established that his sentence, which is largely due to his consecutive sentences under § 924(c), is grossly disproportionate to the crime, so as to trigger Eighth Amendment protections.[21]
*19 CONCLUSION
Our job now finished, we affirm for the reasons we have statéd above. A second opinion, in which we address Rivera-Ru-perto’s separate challenges as to his second trial, issues herewith.

. See, e.g., United States v. Navedo-Ramirez, 781 F.3d 563 (1st Cir. 2015); United States v. González-Pérez, 778 F.3d 3 (1st Cir. 2015); United States v. Diaz-Castro, 752 F.3d 101 (1st Cir. 2014).

. Co-defendants Miguel Santiago-Cordero and Daviel Salinas-Acevedo were tried along with Rivera-Ruperto at his second trial, and we address their challenges in our companion decision as well.

.Although Rivera-Ruperto was not a police officer, he was invited to participate in Operation Guard Shack after he misrepresented himself to the FBI's confidential informant as a prison corrections officer.

. Among those Rivera-Ruperto recruited, at least one was a police officer.

. On September 21, 2010, Rivera-Ruperto was indicted for his participation in the April 14, April 27, June 9, and June 25, 2010 deals. On the same day, the government separately indicted Rivera-Ruperto for his participation in the April 9, 2010 deal. Superseding indictments were later filed, but the charges remained the same. Rivera-Ruperto was then indicted a third time on September 23, 2010 for his participation in the final September 16, 2010 deal.

. The report also suggested that Rivera-Ru-perto may have been exaggerating psychiatric impairment.

. Although the documents themselves are not in the record, the transcript from the Lafler hearing indicates that the parties’ submissions included email correspondence between Aguayo and the government regarding plea negotiations, Aguayo’s records containing detailed notes of his visits and conversations with Rivera-Ruperto, and a document signed by Rivera-Ruperto memorializing his refusal to accept the government's original "final” 12-year plea offer.

. Rivera-Ruperto appears to limit his deficient-performance argument to these bases, and does not challenge the district court’s finding that Aguayo otherwise competently made efforts to get lesser plea deals for his client and adequately explained how the plea bargaining process worked. •

. In fact, "where there are substantial indications that the defendant is not competent to stand trial, counsel is not faced with a strategy choice but has a settled obligation ... under federal law ... to raise the issue with the trial judge and ordinarily to seek a competency examination.” Robidoux v. O'Brien, 643 F.3d 334, 338-39 (1st Cir. 2011).

.The verdict forms (there were two because there were originally two indictments that were consolidated for trial) asked the jury to mark whether it found Rivera-Ruperto "Guilty” or "Not Guilty” for each of the charged counts. Underneath the drug related counts, the verdict form asked the following question:
If you find the defendant guilty, please answer the following additional question:
Do you find that the amount of fake cocaine involved in that offense was (circle one):
A. 5 kilograms or more
B. At least 500 grams but less than 5 kilograms
C.Less than 500 grams

. Although the jury found Rivera-Ruperto guilty of that count, it left the corresponding drug quantity question blank on the verdict form.

. For the September 16 attempted possession conviction, for which the jury had returned no drug quantity finding, the district court imposed the maximum statutory sentence of 20 years for offenses involving an indeterminate quantity of drugs. See 21 U.S.C. § 841(b)(1)(C).

. For all but one of Rivera-Ruperto's convictions, the jury’s drug quantity finding triggered enhanced mandatory minimum sentences and resulted in sentences that exceeded the statutory maximum sentence for undetermined drug quantities. Thus Rivera-Ruperto’s substantial rights would have been affected had the jury instructions been obviously erroneous, and Rivera-Ruperto would have met plain error review’s third prong.

. Reminder: the jury convicted Rivera-Ru-perto of one count of conspiracy and one count of attempted possession for each of the five drug deals, and found for each count (except for the September 16 attempted possession count) that 5 kilograms or more of sham cocaine were involved.

. The judge asked, "That is the sentence of the Court. Anything else, Counsel?” Defense counsel responded by requesting abatement for the special monetary assessment (which the judge granted), but did not bring up the sentencing manipulation issue again.

. In his brief, Rivera-Ruperto appears not to reprise the argument, which he raised below, that the prosecution's charging practices (specifically, its decision to charge the five drug deals separately as opposed to as a single conspiracy) constituted impermissible sentencing manipulation. To the extent that counsel alluded to this issue at oral argument, absent exceptional circumstances, we generally consider as waived issues raised only at oral argument. See United States v. Vazquez-Rivera, 407 F.3d 476, 487-88 (1st Cir. 2005). And even if we were to make an exception here, counsel has provided no evidence that the government was driven by improper motives in charging the drug transactions, which occurred on separate days and involved distinct drug deals, as separate conspiracies.

. As we have already noted, Rivera-Ruperto was not himself a police officer (and turned out not even to be a prison corrections officer, as he had' originally claimed), but among those co-defendants that he recruited to participate in subsequent Operation Guard Shack deals, at least one was an officer in the Puerto Rico Police Department.

. The government makes no argument whatsoever in its brief in this first appeal as to what standard of review applies, but it argues in its brief in Rivera-Ruperto's second appeal that Rivera-Ruperto's Eighth Amendment claim was not properly preserved below, and that plain error review applies. For his part, Rivera-Ruperto does not discuss the standard of review in either opening or reply brief in either appeal.
On our read of the record, at least when it comes to his first sentence, Rivera-Ruperto probably did enough to preserve an Eighth Amendment challenge. At the first sentencing hearing after the first trial, counsel for Rivera-Ruperto argued that the prescribed statutory mínimums had resulted in a punishment that “goes way over, substantially way over, what’s necessary for punishing these offenses,’’ and resulted in a “horribly, horribly increased sentence which borderlines on draconian.” No similar arguments were made at Rivera-Ruperto's second sentencing, but for our purposes today, we will apply the defendant-friendly de novo standard to Rivera-Ru-perto’s challenge to his combined sentence.

. As for the rest of Rivera-Rupertp’s term of imprisonment, as we have already explained, 21 years and 10 months of the sentence were the result of all the remaining convictions from the first trial, and 10 years of the sentence were from the remaining convictions from the second trial.

. In other words, Rivera-Ruperto does not argue that we could somehow find that the remaining 31 years and 10 months resulting from his other convictions were, by themselves, grossly disproportionate to the crimes for which they were imposed.

. Because Rivera-Ruperto fails to establish that his sentence is grossly disproportionate, we need not reach the last two criteria — a comparison of his sentence with sentences received by other offenders in the same jurisdiction or a comparison of his sentence with sentences imposed for the same crime in other jurisdictions. Nevertheless, we note that in comparing Rivera-Ruperto's sentence, the dissent relies largely on the rationale of Judge Cassell in United States v. Angelos, 345 F.Supp.2d 1227 (D. Utah 2004), aff’d, 433 F.3d 738 (10th Cir. 2006). However, despite Judge Cassell’s misgivings about the resulting sentence under § 924(c) for a 24 year old first-time offender in that case, he ultimately (and we think correctly) ruled that:
The court's role in evaluating § 924(c) is quite limited. The court can set aside the statute only if it is irrational punishment without any conceivable justification or is so excessive as to constitute cruel and unusual punishment in violation of the Eighth Amendment. After careful deliberation, the court reluctantly concludes that it has no choice but to impose the 55 year sentence. While the sentence appears to be cruel, unjust, and irrational, in our system of sep *19 arated powers Congress makes the final decisions as to appropriate criminal penalties. Under the controlling case law, the court must find either that a statute has no conceivable justification or is so grossly disproportionate to the crime that no reasonable argument can be made [on] its behalf. If the court is to fairly apply these precedents in this case, it must reject [the defendant’s] constitutional challenges.
Angelos, 345 F.Supp.2d at 1230.
Similarly, we cannot find that the sentence imposed pursuant to § 924(c) has no conceivable justification or is so grossly disproportionate that no reasonable argument can be made on its behalf. However unfair we may deem the life sentence here, we cannot say that the Constitution forbids it.